IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WARFIELD-ROHR CASKET COMPANY, INC.<br><br>Defendant. | CIVIL ACTION NO. WMN-01-2872 |

**PLAINTIFF'S OBJECTIONS TO DEFENDANT'S PROPOSED DEPOSITION DESIGNATIONS OF HOWARD AYRES**

Plaintiff Equal Employment Opportunity Commission objects to the following deposition designations by Defendant of Howard Ayres, on the grounds indicated thereon:

A. Yes.

Q. Anything else you tell him?

A. No.

Q. Did you have any discussions about Mr. Kuehnl's interaction with Mr. Eisenhart?

A. Uh-uh.

Q. How long was the conversation?

A. Not very long. I don't even remember. I didn't really focus on it.

Q. Where did he call you?

A. At Warfield.

Q. He called you at your office?

A. Yeah.

Q. Did you call him back?

A. I truthfully don't remember. I might have.

Q. Okay. Does Mr. Eisenhart work for you in any capacity currently?

A. Uh-uh. Hasn't for -- since 1998.

Calls for hearsay

Q. Okay. So to your knowledge, why did Mr. Eisenhart leave?

hearsay & lack of foundation

A. Aggravation from Mr. Kuehnl.

Q. Did he tell you that?

A. Yes, he told me that.

Q. When did he tell you that?

A. It was just common knowledge in the place that it was Mr. Kuehnl's aggravation of him that he couldn't stand anymore.

Q. So did he tell you that?

A. From time to time I think through the years, he told me about different things he kept on picking on him about.

Q. How long had Mr. Eisenhart worked there?

A. Probably nine years. Somewhere in that area.

Q. Did he ever quit?

A. I think maybe once before and came back.

Calls for hearsay

Q. So from time to time through the years -- and that would be the nine years that he worked there -- he complained about Mr. Kuehnl?

hearsay

A. Yes.

Q. And did he register a complaint in writing or did he talk to you verbally? How did he do that?

A. Verbally.

Q. Did he do it in private?

A. Not very seldom.

Q. Was there a witness when he talked to you about Mr. Kuehnl?

A. No.

Q. What did he say?

Objection: hearsay

A. "He'd teach me to do it this way, and I tried to do it, after a year or so, to do it my way. And because I didn't do it his way, he didn't like it." You know, the whole answer in a nutshell is who cares if it you do it this way or that way as long as the final result's the same? If you're working a job, you find an easier way to do it than the person before you and maybe it's easier for them to do it this way, but maybe it's easier for you to do it that way. I mean

object-ion: hearsay

it's just common knowledge. But that wasn't the way it was there.

Q. So that's what he was telling you, is that he had been taught by Mr. Kuehnl to do it one way, but he had learned to do it a different way?

A. That's one of the things.

Q. And so what was the nature of the complaint? Was he complaining to you that he wanted to do it his way or -- I mean what was he complaining about?

A. He could never satisfy Fred.

Q. Is that what he said to you?

A. Yes.

Q. Anything else that you can recall?

A. There was just other times that -- and he'd pick on him about taking time off and things like that constantly. And like I say, it's been a history through the last 20 years.

Q. So Mr. Eisenhart also complained to you about Mr. Kuehnl picking on him; is that

hearsay

correct?

A. Right.

Q. Okay.

A. Along with everybody else prior to him.

Q. So Mr. Eisenhart complained about other people as well?

A. No. Other people have complained to me in the past about Mr. Kuehnl.

Q. Okay. We will get to those, but right now I want to limit it to what Mr. Eisenhart told you and what you knew the time that he was working there for the nine years.

When he left the first time, why did he leave?

A. It's hard. I couldn't even remember.

Q. After Mr. Eisenhart complained to you about Mr. Kuehnl, did you go and talk to Mr. Kuehnl?

irrelevant & hearsay

A. I've talked to Mr. Kuehnl from time to time about how hard he was on people -- and good

         Q. Okay. Was Mr. Kuehnl charged with making sure he did his job?

A. I would say yes.

Q. Okay.

A. To a degree.

Q. Okay. Explain that to me. What do you mean "to a degree"?

A. Without overdoing it.

Q. And what do you think overdoing it was with regard to Mr. Kuehnl's supervision of Mr. Eisenhart?

A. Being too harsh with him.

lack of foundation

Q. And I believe your testimony is this wasn't the first time that Mr. Kuehnl had been too harsh on his employees; is that correct?

A. That's true.

hearsay

Q. Okay. Other than the complaints that you've discussed with me regarding Mr. Eisenhart, are there any other things that you recall that Mr. Eisenhart complained to you about with regard to Mr. Kuehnl?

hearsay

A. It became a constant thing.

Q. That it was happening over and over again?

A. Over and over and over again.

Q. Okay.

A. And that Fred wasn't doing his part of the work, but that he was doing a lot of work for him and Fred wasn't working.

Q. What is a rush order?

A. It's something probably that a funeral director needs in the next hour or so, a couple of hours.

Q. And when you say "funeral director" --

A. We're talking about caskets, right.

Q. What type of jobs would come into the company that would require a rush within an hour or so?

A. Something that was needed that day for a layout maybe at 2:00.

Q. What's a layout? Did you say layup or out?

out of the building.

Q. Okay. Did he ever have any special projects other than the one that's described here in other places in the building? And I'm referring to Exhibit 4.

A. When his room wasn't busy, he'd like to do other things.

Q. Okay. Now, I'm not talking about what he liked to do, but I'm talking about what he was charged with responsibility to do.

A. He was never charged with any of it. He liked to do it.

Q. He liked to do it. Okay. Did you ever ask him to do any special projects for your personal residence?

A. He probably helped me once or twice while I was taking chemo.

Q. Okay. And when was that, sir?

A. I took chemo from 1998 -- no, from 1999 to -- let me see. I think it was 1998 to 1999. Somewhere in that area.

irrelevant & highly prejudicial

irrelevant & prejudicial

Q. Did you take chemo for an entire year in therapy?

A. I took radiation for a while then chemo. I took chemo for at least seven, eight months.

Q. And what was the treatment for?

A. Hodgkin's disease.

Q. During the seven-month period of time, did you continue to work?

A. As much as I could. I always have.

Q. And how much was that? You worked as much as you could. How much was that?

A. Pretty close to 80 percent.

Q. Okay. So did you go into the office every day?

A. Every day I could.

Q. You didn't punch a time clock; is that correct?

A. No.

Q. Who took over your responsibilities when you weren't in the office?

do duties around the shop?

A. Absolutely.

Q. And that was never asked of him?

A. No.

Q. You never told him to do it?

A. He volunteered in most cases.

Q. Well, you weren't upset with the fact that he would actually do these additional chores, were you?

A. It's better than him sitting doing nothing when there wasn't any work to be done.

Q. Okay. So you viewed it as better than nothing; is that correct? Is that what you just said?

A. It all depends on how you put emphasis on what I just said, it's better than nothing. I mean that might be slang to you. It was better than him sitting there doing nothing.

Q. And how often did he sit there and do nothing?

A. When it was slow, evidently, quite a

lack of foundation & hearsay

lack of foundation, hearsay

bit.

Q. When you say "evidently," does that mean you have no personal knowledge?

A. I've seen some of it, but it's more than I could see.

Q. Okay. I need to know what you personally observed in terms of Mr. Kuehnl sitting around and doing nothing. Not what you heard, but what you personally viewed.

A. I've seen him watch television while he was working, I've seen him put his feet up on the sewing machines, I've seen him ask for something to do.

Q. Okay. When you saw him watching TV in his work -- his work area? Is that where he was, in his work area?

A. Right.

Q. Was there a TV in any other work area?

A. No.

Q. Just the casket trimming area?

A. Right.

couldn't have been there every day because you were out two or three days a month, but --

A. I told you 80 percent of the time. I tried to work as much as I could.

Q. Okay. And when you were in the office, did you always go to the casket trim room department?

Speculation

A. Quite frequently, yes.

Q. And would that mean more than once a day?

A. Possibly.

Q. Do you know for certain?

A. I'm going to go with possibly again.

Q. Well, I don't want you to guess, so -- I mean is it your testimony that you don't know whether or not you were at the casket room once a day? I mean it's possible? Anything's possible.

A. How can I remember?

Q. That's fine. I'm not asking you to remember. If you can't remember, just say "I don't remember."

company time or he did it on company time?

A. It has nothing to do with the company, a lot of the things he did.

Q. Can you describe to me some of the things he did?

A. He might have upholstered a chair for me or whatever it might have been.

Q. And do you pay him apart from his salary at Warfield-Rohr Caskets?

A. In most cases, he didn't want anything.

Q. Okay. What about other cases? Did you pay him apart from --

A. I don't think he ever wanted to take any money.

Q. To your knowledge, did you ever pay Mr. Kuehnl for doing jobs in your personal residence?

A. Not that I know of.

Speculation

Q. None that you knew of. Did you ever offer him any money?

Speculation

A. I probably did.

Q. Do you know that you offered him money?

A. I probably did.

Q. It sounds like you're guessing. I want to know, you know --

A. I'm not guessing, and I can't go back to the exact time when I did or when I didn't. I don't remember.

Q. Okay. So you don't remember --

A. I don't remember.

Q. -- whether you paid him or not?

A. I don't remember.

Q. Okay. How often did he do these jobs around your private residence?

A. It might go two years he didn't do anything and it might go one year he'd do three of them.

Q. Did you ask Mr. Kuehnl to keep records of the work done in the casket trim room?

A. Absolutely not.

AFTERNOON SESSION

(1:35 p.m.)

BY MS. ANDREW:

Q. Okay. I'm going to ask you about Exhibit Number 10 and I'm going to hand that to you and have you look at it for a few minutes, and make sure I have a copy for Mr. Hirsch somewhere in here.

A. Is it only seven on here? Oh, I see it. There's another page. Yeah. Okay.

Q. Okay. Can you identify for the record, Mr. Ayres, what Exhibit 10 is?

A. It's the -- a copy of the original paper that I did -- let Mr. Kuehnl go with. Terminated Mr. Kuehnl with.

Q. Okay. So it's a copy of the original notes that you took when you let Mr. Kuehnl go; is that correct?

A. It's a copy of the notes I prepared prior to meeting with Mr. Kuehnl and I used in presentation when I terminated him.

irrelevant

Q. Okay. I don't know if this is a problem with the copying of the original, but I'd like you to look at the margin on the left-hand side. There's some writing that I can't read there and I wonder if you remember what was on the original or --

MR. HIRSCH: We brought the original.

MS. ANDREW: Okay. Since we're going to be testifying about what is in the margin, is it all there? Because I think what happened is we've got this part cut off.

MR. HIRSCH: It is.

A. I don't even know what it is, to tell you the truth.

MR. HIRSCH: I think it's all there.

Q. Okay. Well, I'll ask you a question about what it is, then I guess what we'll do at the end of the deposition -- you won't have to stop, like, now -- is I'll copy it so we can make a complete record, because I'll be asking you about what's in the margin.

irrelevant

So from what you can see in the margin, there's a word that's underlined. Is that word "never"?

A. Yes.

Q. And that's in your handwriting?

A. Yes.

Q. What are all those marks underneath it?

A. I have no idea.

Q. And then there's a number that looks like the number 23; is that correct?

A. Yeah.

Q. Okay. To your knowledge, do any of those annotations in the margin have anything to do with what is written in this note?

A. Right offhand, I would say no, but -- I don't know how it got there, to tell you the truth, or whether it was there or whether I was doing it when I was talking to him or not. I don't know.

Q. Now, you said you prepared these notes

irrelevant

prior to talking with Mr. Kuehnl. Where were you when you prepared them?

A. In my office.

Q. Were you alone?

A. Yeah.

Q. And the reason you prepared them is because why?

A. Because I was going to terminate Mr. Kuehnl.

Q. Okay. Had you ever terminated anyone before at the company?

A. One other person.

Q. Did you prepare notes like this before you terminated that person?

A. Probably.

Q. Who was that person?

A. Charles Feete.

Q. Okay. I think you testified earlier that you had a salesman leave. Was that a termination or was that a --

A. Yes.

A. My brother-in-law.

Q. Your brother-in-law. Okay. So it's your wife's -- related to your wife?

A. Wife's brother.

Q. Okay. In what capacity did he work at the company?

A. He was a bookkeeper at the time.

Q. Did you have to terminate him?

A. Yes.

Q. And what was the reason for terminating him?

A. We just couldn't work together. It's a personal thing between us.

Q. Did he have any ownership in the company?

A. He might have had a little bit at the time. I'm not absolutely positive. I think he did have some. And at that time, I think we both had a very small amount.

Calls for hearsay, irrelevant

Q. So this is your notes of what you created prior to talking to Mr. Kuehnl. Did

irrelevant + hearsay

you -- why did you prepare these notes? I mean were you -- just tell me why.

A. Because I wanted to include everything that I had to say to him and make sure I said them accurately to him.

Q. Okay. And how many days -- or let me ask it this way. How soon before the actual date that you told him you were going to terminate him had you prepared these notes?

A. Probably just a couple of days.

Q. Did you discuss it with anyone prior to actually terminating Mr. Kuehnl?

A. Probably the morning of.

Q. Who did you discuss it with?

A. Probably Mike Osmeyer and John Rosenberger.

Q. Are you certain of that?

A. The morning of probably, yes.

Q. You're actually certain that you talked to them the morning of the termination?

A. Right.

that's all that they had to say, is that they wanted to keep him?

A. I wanted to keep them out of the relationship with Fred. I wanted to keep them out of the deal. It was my deal, not their deal.

Q. Okay. So that's an additional thing you said to them, that you wanted them to stay out of this because this was your decision? Is that basically what you were saying to them?

A. Right. That's what it says.

Q. Okay. So other than them saying that they didn't want to terminate him, did you recall anything else they may have said?

A. No.

Q. So they -- so, basically, would it be true to say you did not consult anybody other than John and Mike and your wife regarding terminating Mr. Kuehnl; is that correct?

A. Basically, that was the decision.

Colloquy

MR. HIRSCH: What do you mean by "consult"? He said he talked to them. Consult

Colloquy

can be -- have a different meaning, and I just want to make sure that everybody's on the same page.

MS. ANDREW: Yeah, I understand.

Q. I did ask you if you had talked to anybody and you mentioned Mike and John and perhaps your wife. Anybody else that you can remember that you talked to regarding the decision of whether or not to terminate Mr. Kuehnl?

A. Not that I know of.

Q. Did you talk to an attorney? And I want to --

A. No.

irrelevant & hearsay

Q. Okay. Well, let's go over what you wrote down. The first thing that you wrote down was "I have to let you go. Terminate." This is your handwriting, right?

A. It's my handwriting.

Q. "Can't afford you"?

A. Right.

hearsay

Q. What did you mean when you wrote that down, "can't afford you"?

A. We had had some off years with the company because of loss of business. And after consulting with an accountant at year-end of 2000 -- 1999 was not a good year for us and it didn't look like 2000 was going to be any better. And the accountant suggested that we had to take our overhead down some, so I looked for the fat in the company.

Q. What was the name of the accountant?

A. Carl Silex.

Q. How do you spell that?

A. S-I-L-E-X.

Q. Now, did he suggest ways to cut the overhead?

A. He just said we should do something with our overhead. It was getting out of line for the decrease in the business we've had.

Q. Now, what about the decrease in business? What was the cause of the loss of

of a sudden?

A. It came on just like that. People that got out of the business, you wouldn't believe it.

Q. So has your business recovered from that?

A. We've not totally recovered, but we are recovering.

Q. Okay. One of the things I wanted to -- I'm going to be looking at the income statements soon and I wanted to ask you before we start getting into this, the income statement that you've given me, is that I notice that it says "Warfield-Rohr Casket Company Baltimore, Maryland," and you have three other locations?

A. That's probably the whole works because we're -- the headquarters is Baltimore.

Q. Okay. And it's done on a consolidated sheet, correct? I mean all of the businesses --

A. Yes, yes.

Q. Okay. All right. Well, let's

Calls for hearsay

hearsay & irrelevant

continue looking at the exhibit that you have in front of you. It's Exhibit 10, I believe?

A. Yes.

Q. Okay. So you described why you can't afford him. Had you considered alternate ways of cutting your overhead?

A. Yes.

Q. And what were those ways?

A. A lot of it I took away from myself because the bottom line had changed.

Q. Okay. How much had you been paid prior to the business loss? What did you pay yourself prior to the business loss?

A. I paid myself a salary of -- I don't even know right offhand. I couldn't tell you. I'm not prepared.

Q. Well, if I show you some records, would you verify it?

A. The records are the records.

Q. Okay.

A. Do you want me to say yes?

replaced them.

Q. So you just kept your trucks -- the trucks that you used to drive the caskets around longer, right?

A. If a truck had blown an engine or something was wrong with the truck, we didn't replace it.

Q. Okay. So it's a couple or more than -- is it two trucks or more? Do you think it would have been more that you wanted to replace that you didn't?

A. I really don't know. I'm estimating two.

Q. Well, how many trucks do you have total?

A. Probably -- I really don't know. I'm going to say 11, 12.

Speculation

Q. So in 1999 or thereabouts, you would have bought a couple of more trucks had it not been for this downturn in business, correct?

A. I would have replaced them probably,

Speculation

A. Estimate, six years.

Q. And how long had he performed poorly?

A. Six years.

Q. And who was his boss?

A. Myself and John Rosenberger.

Q. Okay. What part of his performance was poor?

A. Not getting enough business, sales.

Q. Okay. Would that be reflected in how much commission he drew?

A. No commission; salary. Because I started him out in a territory and he never grew the territory.

Q. And what territory did you grow him in?

A. Virginia, Virginia Beach, Newport News, Portsmouth.

hearsay & irrelevant

Q. Okay. Looking back at Exhibit Number 10, Number 3 is where we are now. It says "I advised you" -- is that what those words are? "I advised you"?

hearsay

colloquy

hearsay

A. That's what it says.

Q. -- "two years ago when we hired Matt that you and Liz could run room by yourself." Is that what that says?

A. That's exactly what it says.

Q. It might be better if you read it because it's your handwriting, but -- I'll go ahead and read it.

A. Do you want me to read it?

Q. If I read a word that's not right, let me know.

A. I'll read it. Do you want me to read it?

Q. Okay. What's in the big parenthetical?

A. The big what?

MR. HIRSCH: The parentheses.

A. Oh. That's why she's backing off. She don't want to say it.

"You passed remarks like 'What does he want me to do? Shove a broomstick while I'm

Double hearsay

working and sweep the floor?'"

Q. Okay. So --

A. Well, do you want to know where he wanted me to stick the broomstick?

Q. No. But this is a remark you made a note of because --

A. That's what he passed the remark to.

Q. At what time? Is this something he --

A. At the time of the discussion over whether we should hire another trimmer or he should do the job.

Q. Okay. And do you recall when that discussion took place?

A. With him when he said that?

Q. Yes.

A. It never happened to me. It happened to Mike Osmeyer.

Q. Okay.

A. And in his anger over what I expected him to do.

Q. So Mike Osmeyer's having a

conversation with him about what you expect him to do and he says this to Mike?

A. Yes.

Q. Is that what happened?

A. Yes.

Q. So when you were sitting down with Mr. Kuehnl and you're going over these points -- and I'm calling them points. That's my word. And if that's wrong, let me know -- are these your talking points, so to speak?

A. Yes.

Q. Did you actually confront him with having said this remark?

A. Yes.

Q. What was his response to you?

A. He never replied one way or the other. He never denied it.

Q. Okay. With regard to hiring Matt Moore, how was it that that came about? I think you testified that basically, when you hired him, it was your belief, at least as reflected in

hearsay

double hearsay

Q. Okay.

A. It'd be up to him to answer.

Q. And the No. 4 on the Exhibit 10, it says "This is strictly a business decision. It is not personal."

hearsay

A. What is --

Q. "Personnel" is what you wrote, I think.

A. I don't know how to spell. Spell it right.

Q. That's okay. What's that about? Why did you write that?

A. It was a business decision. There wasn't anything personal between me and him. You just told me the relationship went back a lot of time.

Q. So you liked him as a person, correct?

A. At times.

Q. Okay. At this particular time, did you like him as a person?

A. Probably.

Q. You don't remember? Okay. That's fine. So to your recollection, were you angry At Mr. Kuehnl during this time that you decided that he had to go? Did you have a problem with him? I guess I've asked you two questions, so let me stick with the first question. Were you angry at him?

A. I can't say I was.

Q. Did something happen that sort of blew up that said "That's it, I've got to get rid of him," that made you decide that this is the time he had to go?

A. Yeah.

Q. What happened?

lack of foundation & hearsay

A. The same petty bickering that happened with Mike Eisenhart was happening again with Matt Moore, and this time not only Matt Moore. It was Elizabeth. Both of them.

hearsay

Q. Okay. Had Liz ever complained before?

A. Not much until about a year before then.

hearsay

Q. A year before the time you decided he had to go?

A. Yeah.

Q. Okay. What did she complain about?

A. His work ethics, how he wasn't working and they were working.

Q. And did she complain to you directly?

A. Yes.

Q. And what did you say to her?

A. "He's in charge of the room."

Q. Okay. And did she say anything else?

A. Both of them kept on complaining more and more about him not working; letting them work and him not working.

hearsay

Q. Okay. Well, let's look at No. 5. I'm almost through the first page. This says "With the little bit of work in the room only comes to 1.6 caskets a day." Now, why did you write that?

A. Because that's all he was producing. That's all they were -- all three of them were producing.

MR. HIRSCH: She's asking why you wrote the note.

Q. Yeah. Did you do it --

A. This note here?

Q. Yeah.

MR. HIRSCH: Why you wrote the note.

A. To tell him what the room was producing.

Q. Okay. And then Number 6 is "I told you then and I'm telling you now it is only a two-man operation." What was the purpose of writing that down?

Calls for hearsay

A. Because that's all it is, a two-man operation.

Q. And Number 7, it says "John and Mike have nothing to do with it. They want to keep you."

MR. HIRSCH: "With this."

MS. ANDREW: "With this." I'm sorry.

Q. We talked about this earlier. "They want to keep you. Can't afford you."

A. I don't remember.

Q. Did they have any concerns?

A. I don't remember.

Q. But no matter what concerns they had, would it be fair to say that you weren't going to be persuaded by them?

A. No, I wasn't going to be persuaded.

Q. You'd already made up your mind, correct?

A. I'd made up my mind.

Q. Okay. And then the last page of this Exhibit Number 10, there's a notation that starts with May 5th at the top. Do you see that?

A. Right.

MR. HIRSCH: He's got it.

Calls for hearsay

Q. Okay. It says "We will carry Blue Cross/Blue Shield until then." So basically, what you're doing, it looks like -- tell me the purpose of writing that down.

A. I paid him those weeks.

Q. You paid him all the way through June

did you get the numbers 76 and 84 and 56?

A. I probably estimated, I think, off of year-end documents off the pension plan.

Q. Did you talk to anybody who managed the pension plan?

A. No, because it wasn't significant really because he couldn't be paid until now.

Q. So how did you estimate it? You just looked at the year-end plan?

A. Probably.

Q. And then it says at the end "You will have to make an appointment to get your stuff out of here" with an exclamation mark. Is that an exclamation mark at the end of that word?

hearsay

A. Yes.

Q. What was the purpose of putting the exclamation mark?

A. I have no idea.

Q. And why were you telling him that he had to make an appointment to get his stuff out?

A. Because he had a lot of stuff to get

Q. Well, we're still talking about Exhibit Number 10. Mr. Kuehnl says that you told him at the time that you fired him that he was too old, made too much money, and that he had to get the fuck out. What do you say to that? Did you say that to him?

A. At this time?

Q. When you fired him, the day that you fired him.

A. I doubt it very much. I did not. There's what it is right there.

Q. So you didn't say a word outside of what's on these -- this exhibit; is that correct? If it's not on here, you didn't say it?

A. I didn't say that just a little while ago. I just said a little while ago I might have.

MR. HIRSCH: You might have said -- Howard, you need to be very clear what you're talking about. You said you might have what? Said things that weren't on the paper?

Colloquy

Colloquy

THE WITNESS: I testified to it a little while ago.

MR. HIRSCH: I know. And you need to make it very clear right now what you're talking about. You need to say it again. Don't assume somebody --

THE WITNESS: I want to know how I said it the first time.

MR. HIRSCH: Then say it again.

BY MS. ANDREW:

Q. I apologize if I'm trying to -- or if you feel like I'm trying to trick you, but these were talking points and so I do understand that you said you said other things. So when I asked you if you said what Mr. Kuehnl said you said, you said, "I don't doubt -- I doubt it. I don't think I did. What I said is on this paper."

A. So you're saying I --

MR. HIRSCH: Let's start over. I think the witness is confused. Why don't you just reask the question again.

hearsay

treated my employees was not the way I would have treated them, and I had already made the decision it was too late to even consider. Plus both of the people in the room told me if he stayed, that they were going to leave. They couldn't stand it anymore.

Q. Okay. So your answer to his question as to whether he could take a pay cut and stay was no?

A. Yes.

Q. So you did say no?

A. Yes.

Q. Did you even consider it a second?

A. No.

Q. Had you ever considered it before?

A. No.

Q. Why not?

A. I don't do that to people.

Q. You don't cut their pay?

A. No.

Q. You cut your own pay.

thought that's what the significance is, but now you're telling me that the additional significance could be or is that those are the weeks you would pay him severance pay, correct? Or you can say you don't know. I mean I'm just asking you.

A. I don't understand what you're saying. I think it's clear as can be right in front of your face that that's the dates I told him.

Q. Okay. So I'm looking at Page 3 of your notes and you're saying these are the weeks you told him what?

A. That I was going to pay him severance pay.

Q. It doesn't say "severance pay" anywhere on this page, does it? But if you have a recollection that's what you meant when you wrote down those weeks, then that's your testimony.

A. That's my testimony.

Q. Okay. All right. And is it true that

hearsay

Respectfully submitted,

GERALD S. KIEL
Regional Attorney


DEBRA M. LAWRENCE
Supervisory Trial Attorney

REGINA M. ANDREW
Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Baltimore District Office
10 S. Howard Street, 3rd Floor
Baltimore, Maryland 21201
Tel.: (410) 962-4220