## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT................................................................................................................. 6

I.     WARFIELD-ROHR IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
       PURSUANT TO FED. R. CIV. P. 50 ................................................................ 6

       A.     Standard of Review ................................................................................ 6

       B.     Warfield-Rohr is Entitled to Judgment as a Matter of Law Under Both the
              McDonnell Douglas Analysis and the Mixed Motive Analysis ............................ 7

              1.     EEOC Cannot Establish Discrimination Under the McDonnell
                     Douglas Test ................................................................................ 7

II.    THE EEOC CANNOT ESTABLISH DISCRIMINATION UNDER THE MIXED
       MOTIVE ANALYSIS AS A MATTER OF LAW........................................... 11

III.   WARFIELD-ROHR IS ENTITLED TO A NEW TRIAL PURSUANT TO  FED.
       R. CIV. P. 59 .................................................................................................. 19

       A.     Standard of Review ............................................................................... 20

       B.     The Court Must Order a New Trial Because the Jury's Verdict is Against
              the Weight of the Evidence ................................................................... 20

       C.     The Court Must Grant a New Trial Because the Jury's Verdict was Based
              on False Information.............................................................................. 23

       D.     The Court must Grant a New Trial Because the Jury Instructions Were
              Improper................................................................................................ 28

       E.     The Court Must Grant a New Trial Because the Verdict was Excessive and
              Did Not Properly Account for the Fact that Mr. Kuehnl Failed to Mitigate
              his Damages ......................................................................................... 30

CONCLUSION................................................................................................................ 37

## TABLE OF AUTHORITIES

### FEDERAL CASES

Abioye v. Sundstrand Corporation, 164 F.3d 364 (7th Cir. 1998) ................................................19

Adams v. Moore Business Forms, Inc., 224 F.3d 324 (4th Cir. 2000) ............................................9

Adler v. Madigan, 939 F.2d 476 (7th Cir. 1991) ...................................................................18, 19

Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350 (4th Cir. 1941) ........................................20

Allen v. Diebold, Inc., 33 F.3d 674 (6th Cir. 1994).....................................................................10

Anderson v. Baxter Healthcare Corp., 13 F.3d 1120 (7th Cir. 1994)...........................................10

Anderson v. Branen, 17 F.3d 552 (2nd Cir. 1994) ......................................................................40

Anderson v. Liberty Lobby Inc., 477 U.S. 242, 250 (1986)…………………………………..18

Atlas Food Systems and Service v. Crane National Vendors, 99 F.3d 587 (4th Cir. 1996)..........20

Bailey v. County of Georgetown, 94 F.3d 152 (4th Cir. 1996) ......................................................6

Birkbeck v. Marvel Lighting Corp., 30 F.3d 507 (4th Cir. 1994) ................................................24

Blistein v. St. John's College, 860 F. Supp. 256 (D.Md. 1994)................................................9, 10

Bossalina v. Lever Brothers  Co., 47 Fair Empl. Prac. Cas. 1264 (D.Md. 1986) .........................49

Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269 (4th Cir. 1985) ...........................................46

Children's  Broadcasting Corp. v. The Walt Disney Company, 245 F.3d 1008 (8th Cir. 2001)) ....................................................................................................................................26

Chute v. Sears Roebuck and Co., 143 F.3d 629 (1st Cir. 1998) ...................................................38

Cline v. Roadway Express, Inc., 689 F.2d 481 (4th Cir. 1982)...............................................42, 48

Cline v. Wal-Mart Stores, Inc., 144 F.3d 294 (4th Cir. 1998)……………………………………31

DeNio v. Asplundh Tree Expert Company, 1996 WL 423125 (4th Cir. 1996)............................7

DeJarnette v. Corning, Inc., 133 F.3d 293 (4th Cir. 1998) ............................................................15

Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S. Ct.  2148 (2003)................................................37

Duke v. Uniroyal Inc., 928 F.2d 1413 (4th Cir. 1991) ............................................................34, 36

EEOC v. Clay Printing Co., 955 F.2d 936 (4th Cir. 1992) ............................................................24

EEOC v. Joe's Stone Crab, Inc., 15 F. Supp. 2d 1364 (S.D. Fla. 1998) .......................................48

EEOC v. Warfield-Rohr Casket Company, Inc., 364 F.3d 160 (4th Cir. 2004) .......1, 7, 11, 13, 16, 17, 38

Eastern Automobile Distributing v. Peugeot Motors of America, 795 F.2d 329 (4th Cir. 1986) ...............................................................................................................................6

Elcock v. K-Mart Corp., 233 F.3d 734 (3rd Cir. 2000) ................................................................30

Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386 (D.Md. 1997)..............................................48, 50

Franklin v. Mazda Motor Corp., 704 F. Supp. 1325 (D. Md. 1989)............................................28

Fuller v. Phipps, 67 F.3d 1137 (4th Cir. 1995) ...........................................................................37

Gasperini v. Center for Humanities, Inc., 116 S. Ct. 2211 (1996) ................................................20

Gibson v. Old Town Trolley Tours of Washington, D.C., 160 F.3d 177 (4th Cir. 1998) ..............6

Griffiths v. Cigna Corp., 988 F.2d 457 (3rd Cir. 1993)................................................................38

Gumbs v. International Harvester, Inc., 718 F.2d 88 (3rd Cir. 1983)............................................28

Hansard v. Pepsi Cola Metropolitan Bottling Company, Inc., 865 F.2d 1461 (5th Cir. 1989) ................................................................................................................49

Harris v. Shelby County Board of Education, 99 F.3d 1078 (11th Cir. 1996) ............................19

Hawkins v. Pepsico, Inc., 203 F.3d 274 (4th Cir. 2000)...........................................................15

Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313 (1st Cir. 1999) ........................28

James v. New York Racing Association, 233 F.3d 149 (2d Cir. 2000).........................................10

Jiminez v. Mary Washington College, 57 F.3d 369 (4th Cir. 1995)............................................15

Lincoln v. Billington, 1998 WL 51716 (D.D.C.).......................................................................7

Malina v. BG&E, 18 F. Supp. 2d 596 (D.Md 1998)..........................................................7, 8, 10

McGaha v. Quality Metal Products, Inc., 1999 WL 175918 (W.D.N.C.) ...................................7, 8

Mereish v. Walker, 359 F.3d 330 (4th Cir. 2004).....................................................................38

Meyer v. United Airlines, Inc., 950 F. Supp. 874 (N.D. Ill. 1997) .............................................50

Miller v. AT&T Corp., 250 F.3d 820 (4th Cir. 2001)................................................................42

Miller v. Cigna Corp., 47 F.3d 586 (3rd Cir. 1995)..................................................................38

Mitchell v. Data General Corporation, 12 F.3d 1310 (4th Cir. 1993) ...........................................8

O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542 (4th Cir. 1995).............................24

PPM America, Inc. v. Marriott Corp., 875 F. Supp. 289 (D. Md. 1995) ...................................6, 18

Sanders v. New York City Human Resources Administration, 361 F.3d 749 (2nd Cir. 2004) .......................................................................................................39

Smith v. Great American Restaurants, Inc., 969 F.2d 430 (7th Cir. 1992) .................................42

Swentek v. US Air, Inc., 830 F.2d 552 (4th Cir. 1987) .............................................................20

Szedlock v. Tenet, 139 F. Supp. 2d 725 (E.D. Va. 2001)...............................................42, 46, 50

Wadsworth v. Clindon, 846 F.2d 265 (4th Cir. 1988) ...............................................................20

<u>Williams v. Imperial Eastman Acquisition Corp.</u>, 994 F. Supp. 926 (N.D. Ill. 1998) ............48, 52

<u>Wyatt v. Interstate & Ocean Transport Co.</u>, 623 F.2d 888 (4th Cir. 1980) ...................................36

<u>Zervitz v. Hollywood Pictures</u>, 995 F. Supp. 596 (D. Md. 1996)...................................................42

## FEDERAL STATUTES

Age Discrimination in Employment Act, 29 U.S.C. § 626(b) (the "ADEA") ................................5

Fed. R. Civ. P. 50(a) ...........................................................................................................18, 20

Fed. R. Civ. P. 59 ....................................................................................................................20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY    *
COMMISSION    *
   *
     Plaintiff,    *
   *
     v.    *      Civil Action No. WMN-01-2872
   *
WARFIELD-ROHR CASKET COMPANY, INC.    *
   *
     Defendant.    *
   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM IN SUPPORT OF DEFENDANT WARFIELD-ROHR CASKET COMPANY, INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND/OR FOR A NEW TRIAL AND/OR REMITTITUR**

Defendant Warfield-Rohr Casket Company, Inc. ("Warfield-Rohr") submits this Memorandum in support of its motion for judgment as a matter of law and/or for a new trial, and/or for remittitur.

**INTRODUCTION**

On March 17, 2003, this Court granted Warfield-Rohr's Motion for Summary Judgment, ruling that "no rational fact finder could reasonably conclude that Plaintiff was terminated because of his age." The EEOC appealed this Court's decision. The fourth circuit held that although Warfield-Rohr had demonstrated legitimate, non-discriminatory reasons for terminating Mr. Kuehnl's employment, the record did not conclusively establish that Warfield-Rohr would have terminated Mr. Kuehnl if age had not been considered. In essence, the fourth circuit believed Mr. Kuehnl was entitled to his day in court. <u>EEOC v. Warfield-Rohr Casket</u>

Company, Inc., 364 F.3d 160, 165 (4th Cir. 2004).  From February 22nd through February 25th,

Mr. Kuehnl had his "day in court."

The jury ruled in favor of Mr. Kuehnl and awarded him approximately

$397,000.00.  The jury's decision was legally incorrect and against the weight of the evidence.

The full presentation of the evidence at trial demonstrated that this Court's initial ruling on

summary judgment was correct and that the potential factual issues identified by the fourth

circuit do not prevent the entry of judgment in Warfield-Rohr's favor as a matter of law.

Moreover, the jury's decision and award of damages is so contrary to the evidence presented at

trial that its decision must have been a product of sympathy, a misapprehension of applicable

law, or some other improper reason.  For the reasons described below, this Court should enter

judgment as a matter of law in favor of Warfield-Rohr and/or grant a new trial.

## STATEMENT OF FACTS

Warfield-Rohr is a small, family owned wholesale distributor of burial caskets

which was started in 1870.  As part of its business over the years, Warfield-Rohr has installed

custom interiors in caskets for certain customers.  Warfield-Rohr refers to this installation

process as "trimming" a casket.  In 1971, Frederick Kuehnl was hired by Warfield-Rohr to trim

caskets.  At that time, there were approximately thirteen people working in the casket trimming

room at Warfield-Rohr.  The work in the trimming room is organized into two basic categories:

sewing and trimming.  The sewers prepare the fabric materials utilized in the casket trimming,

and the trimmers install the interior of the casket.  Mr. Kuehnl originally was hired solely as a

casket trimmer.

In 1982, Mr. Kuehnl became the working foreman of the casket trimming room

and was converted from an hourly employee to a salaried employee.  As foreman, Mr. Kuehnl

supervised both the sewing and trimming work performed in the casket trimming room.  Mr.

Kuehnl was also still required to trim caskets himself.  Mr. Kuehnl admitted at trial that casket

trimming was always a part of his job.  Over the years, the work in the casket trimming room

decreased substantially, as did the need for employees in the trimming room.

By the beginning of 1998, there were only three people working in the casket

trimming room:  Mr. Kuehnl, a trimmer (Michael Eisenhardt), and a seamstress (Elizabeth

Skenderovic).  When Mr. Eisenhardt quit in January, 1998, due to disagreements with Mr.

Kuehnl, Howard Ayres, president of Warfield-Rohr, told Mr. Kuehnl that he did not want to

replace Mr. Eisenhardt because he believed that the trimming room could be operated with only

one other employee, Ms. Skenderovic.  Mr. Kuehnl disagreed, and told Mr. Ayres that he needed

a third person in the casket trimming room, and that he wanted to hire someone to replace Mr.

Eisenhardt.  Ultimately, Mr. Ayres relented and agreed to hire a replacement for Mr. Eisenhardt.

In April 1998, Matthew Moore was hired as a casket trimmer to replace Mr.

Eisenhardt.  Within six to eight months, Mr. Kuehnl had fully trained Mr. Moore.  Mr. Moore,

however, did not get along with Mr. Kuehnl.  Mr. Kuehnl admitted at trial that Mr. Moore

frequently became upset with him and complained about him.  In fact, many co-workers over the

years did not get along with Mr. Kuehnl, including Mr. Moore's predecessor, Mr. Eisenhardt,

who quit because of the manner in which Mr. Kuehnl treated him.  Prior to Mr. Kuehnl's

termination, the morale in the casket trimming room had deteriorated to the point where both Mr.

Moore and Ms. Skenderovic were planning to quit because of Mr. Kuehnl.

At this same time, Warfield-Rohr's sales and profitability had declined

substantially.  For the year ending in December, 1997 (just prior to Mr. Eisenhardt quitting),

Warfield-Rohr had sales of approximately $10.4 Million Dollars, and income from operations of

approximately $275,000.  By December 1999, sales had dropped more than 20% to approximately $8 Million Dollars, and income from operations had plummeted over 75%, to approximately $66,000.  As a result, the company decided that overhead needed to be cut.  To that end, in 2000, Warfield-Rohr terminated two employees:  an under-performing salesman and Mr. Kuehnl.  Prior to Mr. Kuehnl's termination, Warfield-Rohr had 23 full-time employees.  The termination of two employees in 2000 constituted almost a 10% reduction of its work force.

Mr. Kuehnl was selected for termination for several reasons.  As Mr. Ayres had recognized in 1998, the casket trimming room had become only a two person operation.  When Mr. Ayres had explained this to Mr. Kuehnl after Mr. Eisenhardt had quit in 1998, Mr. Kuehnl insisted that a third person be hired, namely, Mr. Moore.  Between the time when Mr. Moore was hired and 2000, Mr. Kuehnl's relationship with Warfield-Rohr management (and particularly Mr. Ayres) deteriorated.  Due to Mr. Kuehnl's refusal to accept the fact the trimming room had become a two person operation, the company's need to cut costs, and Mr. Kuehnl's alienation of company management, as well as the two people who were actually performing the majority of the work in the casket trimming room – both of whom were contemplating quitting– Warfield-Rohr had little choice but to terminate Mr. Kuehnl.[1]  No one was ever hired to replace Mr. Kuehnl.  The casket trimming room continued to operate with only Mr. Moore and Ms. Skenderovic, neither of whom acted as a foreman or supervisor.  Mr. Kuehnl's position, therefore, was eliminated.

---

[1]     Mr. Kuehnl testified in his deposition that, at this point in time, he was spending no more than 30-40% of his time performing work in the trimming room.  At trial, Mr. Kuehnl testified it was 50% of the time.

Approximately ten months after his termination, Mr. Kuehnl filed a charge with the EEOC claiming that he was discriminated against because of his age.  On September 25, 2001, the EEOC filed this action alleging a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626(b) (the "ADEA").

Mr. Kuehnl testified that Mr. Ayres told him that he was "too old" and "made too much money" when Mr. Ayres terminated his employment.  Mr. Ayres testified that he did not tell Mr. Kuehnl that he was being terminated because of his age, and, in fact, that age had nothing to do with Mr. Kuehnl's termination.

Contemporaneous documentary evidence from both Mr. Ayres and Mr. Kuehnl supports Mr. Ayres' version of the facts.  As Mr. Kuehnl testified in his deposition, Mr. Ayres referred to written notes when he was terminating him.  Mr. Ayres' notes do not contain a single reference  to Mr. Kuehnl being "too old."  To the contrary, Mr. Ayres' notes show that Mr. Kuehnl was terminated for the reasons enumerated above – Warfield-Rohr needed to cut costs, and Mr. Kuehnl had demonstrated his unwillingness to operate the casket trimming room with only one other person.

Even more significantly, Mr. Kuehnl's own contemporaneous notes do not reflect any statement about his age.  Mr. Kuehnl maintained a personal journal at work from 1982 through his termination.  Mr. Kuehnl testified that after his termination, he went home and wrote an entry in his journal about his termination.  Nowhere in Mr. Kuehnl's own handwritten notes does he state that Mr. Ayres told him that he was "too old."  It was not until Mr. Kuehnl filed his complaint with the EEOC – ten months after his termination – that Mr. Kuehnl claimed that Mr. Ayres told him he was "too old."

The evidence, therefore, is overwhelming that age played no part in Mr. Kuehnl's termination. Nevertheless, the jury rendered a verdict in Mr. Kuehnl's favor in excess of $397,000. For the reasons set forth below, the Court should grant Defendant's motion for judgment as a matter of law as well as its motion for a new trial.

## ARGUMENT

## I.    WARFIELD-ROHR IS ENTITLED TO JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50

### A.    Standard of Review

In ruling on a Motion for Judgment under Rule 50, the Court must consider the entire trial record and "determine whether sufficient evidence supported the jury's verdict." Gibson v. Old Town Trolley Tours of Washington, D.C., 160 F.3d 177, 181 (4th Cir. 1998). "A mere scintilla of evidence is insufficient to defeat a motion for a directed verdict… Rather, an issue can only be submitted to a jury when it is **supported by substantial evidence which shows a probability and not a mere possibility of proof**." Eastern Auto Distrib. v. Peugeot Motors of America, 795 F.2d 329, 335 (4th Cir. 1986) (emphasis added); Bailey v. County of Georgetown, 94 F.3d 152, 157 (4th Cir. 1996) (same).

Although the Court must draw all reasonable inferences in favor of plaintiff, plaintiff cannot rely on "speculative or conjectural inferences." PPM America, Inc. v. Marriott Corp., 875 F. Supp. 289, 293 (D. Md. 1995). Nor can plaintiff attempt to create a factual dispute by "the building of one inference upon another." Id. at 296. In this case, there is no evidence – let alone the substantial evidence required – to permit the jury to conclude that Warfield-Rohr would not have terminated Mr. Kuehnl, irrespective of any purported discriminatory motive.

**B.    Warfield-Rohr is Entitled to Judgment as a Matter of Law Under Both the McDonnell Douglas Analysis and the Mixed Motive Analysis**

An ADEA claim can be established either through the mixed motive framework or the "pretext" framework outlined in McDonnell Douglas. EEOC v. Warfield-Rohr, 364 F.3d at 163. As this Court recognized in its Summary Judgment Opinion, Plaintiff could not prevail, as a matter of law, under the McDonnell Douglas framework. The fourth circuit's decision did not disturb this finding. Indeed, the evidence presented at trial underscored that this Court's original decision was correct.

**1.    EEOC Cannot Establish Discrimination Under the McDonnell Douglas Test**

In order to prevail under the McDonnell Douglas test, the EEOC needs to establish a prima facie case and show that the legitimate, non-discriminatory reasons proffered by Warfield-Rohr are pretextual. The EEOC cannot make either of these showings.

First, the EEOC cannot establish a prima facie case under McDonnell Douglas. In order to do so, the EEOC must show that after Mr. Kuehnl's dismissal, he was replaced by a younger person with similar qualifications, or that a younger person was retained in his position. DeNio v. Asplundh Tree Expert Company, 1996 WL 423125 at 5-6 (4th Cir. 1996) (unpublished decision).[2] The EEOC cannot establish this element because Mr. Kuehnl was not replaced, and neither of the two remaining employees in the casket trimming room assumed his job

---

[2]    Despite the fact that DeNio is an unpublished decision, its facts are so similar to the case at bar that it has substantial precedential value to the central issues here. Moreover, it has been cited by this Court in Malina v. BG&E, 18 F. Supp. 2d 596, 607 (D.Md 1998) as well as in other federal cases, including Lincoln v. Billington, 1998 WL 51716 (D.D.C.) and McGaha v. Quality Metal Products, Inc., 1999 WL 175918 (W.D.N.C.). A copy of the DeNio case is attached hereto as Exhibit A.

responsibilities as foreman.  As Mr. Kuehnl testified, at the time of his termination he was the

only person with supervisory responsibilities in the casket trimming room.  Both Mr. Moore and

Ms. Skenderovic testified that they do not have any supervisory responsibility and the trimming

room has operated since Mr. Kuehnl's termination with only two employees. Their testimony

was uncontradicted.

       The fourth circuit held in the <u>DeNio</u> case that under these precise circumstances, a

working supervisor who was terminated and not replaced could not establish a prima facie case

of discrimination.  In <u>DeNio</u>, the plaintiff was the working supervisor in a three person parts call-

in department.  The other two employees in the department were significantly younger (ages 29

and 30), and made significantly less money than the plaintiff.  Plaintiff was terminated after 27

years of service to cut costs. <u>Id</u>. at 1-2.  As in the case at bar, neither of the two remaining

employees in <u>DeNio</u> were promoted to supervisor. <u>Id</u>.  Mr. DeNio attempted to establish a prima

facie case by arguing that the two co-workers who were retained performed job responsibilities

similar to his former position. <u>Id</u>. at 5.  The fourth circuit rejected this argument and held, as a

matter of law, that Mr. DeNio could not establish a prima facie case because neither of the

remaining workers were retained in his position, <u>i.e.</u>, a worker with supervisory responsibilities.

<u>Id.</u>  Based on the fourth circuit's ruling in <u>DeNio</u>, the EEOC cannot establish a prima facie case

here under the <u>McDonnell Douglas</u> test.

       Even assuming, <u>arguendo</u>, that the EEOC could establish a prima facie case of

discrimination, Warfield-Rohr would still be entitled to judgment as a matter of law under the

<u>McDonnell Douglas</u> test because it had undisputed, legitimate, non-discriminatory reasons for

terminating Mr. Kuehnl.  <u>Mitchell v. Data General Corporation</u>, 12 F.3d 1310, 1316 (4th Cir.

1993); <u>Malina v. BGE</u>, 18 F. Supp. 2d 596, 602 (D. Md. 1998).  Mr. Kuehnl's own journal

reflects that the very first justification given by Mr. Ayres for his termination was "I can't afford you." (Defendant's trial exhibit 5). Indeed, Mr. Kuehnl admitted at trial that he believed one of the reasons Warfield-Rohr terminated him was because the company could not afford him. Warfield-Rohr's justification is supported by its financial statements which showed that, as of December 1999 (a few months prior to Mr. Kuehnl's termination), sales had dropped more than 20%, and income from operations had fallen over 75% over the previous two years.

(Defendant's trial exhibit 1; Ayres Deposition at 238-40).[3]

Moreover, as a result of its financial difficulties, Warfield-Rohr terminated another employee in 2000 and had been forced to incur an unprecedented amount of debt. Warfield-Rohr's justification is further buttressed by the fact that Mr. Ayres had told Mr. Kuehnl in January, 1998 that the casket trimming room had become a two-person operation, and that Mr. Kuehnl had insisted on the hiring of a third person. Mr. Kuehnl testified at trial that Mr. Ayres had told him that he did not want to hire a third person for the casket trimming room in 1998, and that Mr. Kuehnl insisted that Mr. Ayres do so.

The undisputed fact that Warfield-Rohr terminated Mr. Kuehnl to save money, by itself, is a sufficient non-discriminatory reason to support judgment as a matter of law. Blistein v. St. John's College, 860 F. Supp. 256 (D.Md. 1994), aff'd, 74 F.3d 1459 (4th Cir. 1996), overruled, in part, on other grounds, by Adams v. Moore Business Forms, Inc., 224 F.3d 324 (4th Cir. 2000). This Court, in Blistein, held that, even if an employee could establish a prima facie case of discrimination, the employer would still be entitled to summary judgment, if the

---

[3]    The portions of Mr. Ayres' deposition referenced in this Memorandum were read into evidence during the trial and are attached hereto as Exhibit B.

employer demonstrated a non-discriminatory reason for discharging. Blistein, 860 F. Supp. at 264. This Court further held in Blistein that firing an employee because his salary was too high constituted just such a non-discriminatory reason: "However, in the light of Hazen Paper, a salary based decision, even if it correlates with years of service and/or age, cannot be a basis for an ADEA suit." Id., 860 F. Supp. at 265. The fourth circuit's decision in DeNio is in direct accord: "Accordingly, even if DeNio was fired simply because Asplundh desired to reduce its salary costs, this was not evidence of age discrimination."[4] DeNio, supra at 3.

The additional undisputed facts elicited at trial (and listed in Section II, infra) make Warfield-Rohr's non-discriminatory justification for terminating Mr. Kuehnl even more compelling than in Blistein or DeNio. No evidence was proffered by the EEOC to suggest – let alone establish – that the fact that Warfield-Rohr was terminating Mr. Kuehnl to cut costs (or that any of Warfield-Rohr's other justifications) were pretextual. Accordingly, Warfield-Rohr is entitled to judgment as a matter of law under the McDonnell Douglas test, even if the EEOC were able to establish a prima facie case of discrimination. Malina, 18 F. Supp. 2d at 602, 605; Blistein, 860 F. Supp. at 265; DeNio, at 3.

---

[4]    Other Circuits are also in direct accord. See, Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1126 (7th Cir. 1994) ("Consequently, Anderson could not prove age discrimination, even if he was fired, simply because Baxter desired to reduce its salary costs by discharging him."); Allen v. Diebold, Inc., 33 F.3d 674, 679 (6th Cir. 1994) ("The heart of plaintiffs' allegation – that defendant replaced them with younger workers because they were too costly – does not state a claim under the ADEA."); James v. New York Racing Association, 233 F.3d 149, 153 (2d Cir. 2000) ("… the remarks James proffered about saving NYRA for younger employees, and about the need for older supervisors to retire, clearly represented the hope that, over time, the older personnel would retire, and thereby reduce the high costs associated with more senior supervisory employees. Such concern with the elevated costs of senior employees does not constitute age discrimination.")

## II.    THE EEOC CANNOT ESTABLISH DISCRIMINATION UNDER THE MIXED MOTIVE ANALYSIS AS A MATTER OF LAW

As this Court noted in its summary judgment ruling, and as the fourth circuit held in its appellate decision, even if the existence of direct evidence of discriminatory intent is assumed, Warfield-Rohr can still prevail as a matter of law by proving that it would have terminated Mr. Kuehnl's employment regardless of any purported discriminatory intent.  EEOC v. Warfield Rohr, 364 F.3d at 164.  This Court held in its summary judgment decision that "a reasonable jury could only find that Defendant did not fire Kuehnl because of his age."  Based on the record presented on appeal, the fourth circuit disagreed.  The full record presented at trial, however, makes clear that this Court's original decision granting summary judgment was correct.  The undisputed evidence at trial showed that:

- In January 1998, Mr. Ayres told Mr. Kuehnl that the trimming room had become a two person operation and that he could handle the room with only Ms. Skenderovic;

- Mr. Kuehnl insisted that another casket trimmer (Matt Moore) be hired in 1998.  Mr. Moore was interviewed and hired by Mr. Kuehnl.

- From 1998 through 2000 Mr. Kuehnl complained that he needed the extra person in the trimming room.  Mr. Kuehnl graphically illustrated his perceived need for the extra person by asking Mr. Osmeyer: "What does Howard [Ayres] expect me to do, shove a broomstick up my ass while I'm working and sweep the floor?"

- Mr. Kuehnl testified at trial that the volume of work in the trimming room remained constant from the time Mr. Eisenhardt quit (January 28, 1998) through the time he was terminated (April 28, 2000).  Warfield-Rohr's records confirmed this (Defendant's trial exhibit 10);

- Mr. Kuehnl testified at trial that right up to the time he was terminated he believed the trimming room required three people;

11

- Mr. Kuehnl admitted that over the last two years he worked at Warfield-Rohr he only spent a fraction of his time working in the trimming room. [5]

- Ms. Skenderovic and Mr. Moore, the other two trimming room employees testified that Mr. Kuehnl spent very little time doing any work in the trimming room.  Instead, Mr. Kuehnl spent most of his time in the trimming room watching television;

- Because of Mr. Kuehnl's refusal to work, Mr. Moore and Ms. Skenderovic both threatened to quit;

- Mr. Kuehnl set his own work schedule – even though he admitted at trial he was not permitted to do so.  Mr. Kuehnl regularly left early and took Fridays off, prompting Warfield-Rohr to enact a written vacation policy (Defendant's trial exhibit 9);

- Mr. Osmeyer told Mr. Kuehnl repeatedly over the last two years of Mr. Kuehnl's employment that he needed to be at work during regular hours and do his job;

- In response to one of his conversations with Mr. Osmeyer, Mr. Kuehnl said that he thought that "work was supposed to get easier as you got older";

- During the years 1998 and 1999 Warfield-Rohr's sales dropped 20% and its income from operations dropped 75%;

- Mr. Ayers, in consultation with Warfield-Rohr's Accountant, determined that the company needed to cut costs.

- Mr. Kuehnl admitted that Mr. Ayres told him that Warfield-Rohr could not afford him (and his journal notes confirm this) (Defendant's trial exhibit 5).  Indeed, Mr. Kuehnl testified that he believed one of the reasons he was terminated was because the company could not afford him;

- Mr. Kuehnl admitted his relationship with Mr. Ayres deteriorated in his last two years of employment;

- At the time of Mr. Kuehnl's termination, three-quarters of Warfield-Rohr's employees were over 40 years old and more than one-third of its workforce was older than Mr. Kuehnl;

---

[5]    In his deposition, Mr. Kuehnl testified he spent only 30-40% of his time working in the trimming room.  At trial he testified it was 50%.

- In 1998, 1999 and 2001, Warfield-Rohr hired individuals <u>older</u> than Mr. Kuehnl;

- Over the last twenty years, eight people retired from Warfield-Rohr.

The foregoing evidence compels the conclusion that Warfield-Rohr was going to terminate Mr. Kuehnl's employment regardless of his age. The fact that Warfield-Rohr needed to cut costs is undisputed – Mr. Kuehnl even admitted at trial that he believed that is one of the reasons that he was terminated. As discussed above, a decision to fire a high-salaried employee is not discriminatory as a matter of law: "a salary-based decision, even if it correlates with years of service and/or age, cannot be a basis for an ADEA suit." <u>Blistein</u>, supra at 265; <u>supra</u>, pp. 9-10. Therefore, there can be no question that Warfield-Rohr would have terminated Mr. Kuehnl, even in the absence of any purported discriminatory motive, in order to cut costs as required by its deteriorating financial condition. When considered in light of Mr. Kuehnl's refusal to operate the room with only one person, and all of the other undisputed evidence listed above, there can be no question that Warfield-Rohr did not discriminate against Mr. Kuehnl.

Moreover, the purported factual disputes upon which the fourth circuit based its reversal of this Court's summary judgment were resolved at the trial. The fourth circuit stated in its opinion:

> although Kuehnl had previously insisted that he needed two other employees to run the trimming room, it is not clear that Kuehnl still maintained this view two years later when he was terminated – particularly since the workload had continued to shrink.

364 F.3d at 165, n.3.

Mr. Kuehnl's own testimony answered this question definitively. Mr. Kuehnl testified that the work load in the trimming room remained constant from January 1998 through April 2000, and Warfield-Rohr's records confirm his conclusion (Defendant's trial exhibit 10).

More importantly, Mr. Kuehnl testified that he always thought the trimming room needed three people. There can be no question, therefore, that Mr. Kuehnl maintained this view at the time of his termination. There can also be no question, based on Mr. Kuehnl's comments about believing that "work got easier as you got older," and about having to "shove a broom up his ass to sweep the floor while he was working," that Mr. Kuehnl communicated his view to Warfield-Rohr.

Indeed, Mr. Ayres' notes reflect this. The first three talking points in Mr. Ayres notes are as follows:

1.    I have to let you go – terminate

2.    Can't afford you

3.    I advised you 2 years ago when we hired Matt that you and Liz could run room by yourself. (You passed remarks like what he want me to do shove a broomstick while I'm working and swept the floor).

Defendant's trial exhibit 3. Mr. Ayres' talking point number 3[6] shows clearly why Mr. Kuehnl was selected for termination. Mr. Kuehnl had been told two years earlier that he needed to run the room as a two person operation and he refused. Since that time Mr. Kuehnl continued to make comments reflecting that he believed the trimming room required three people. Therefore, based on the foregoing record, there can be no doubt that Mr. Kuehnl was chosen for termination for a non-discriminatory reason.

No reasonable business person would attempt to cut costs by retaining the highest paid employee in a department who:  1) made more than the other two employees combined; 2) had a history of driving away employees; 3) had alienated his current co-workers to the point

---

[6]    Mr. Ayres reiterates the point in item 6 of his notes. (Defendant's trial exhibit 3).

where they were threatening to quit;  4) no longer was getting along with management; 5) had refused to operate the department with only one other person; and 6) was spending only a fraction of his time working in the department.  None of these justifications for terminating Mr. Kuehnl are disputed.  To the contrary, Mr. Kuehnl admits them.  The fourth circuit has cautioned many times that employment law "is not a vehicle for substituting the judgment of a court for that of the employer."  Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995); Hawkins v. Pepsico, Inc., 203 F.3d 274, 282 (4th Cir. 2000) (same); DeJarnette v. Corning, Inc., 133 F. 3d 293, 299 (4th Cir. 1998) ("… it is not our province to decide whether the reason [for termination] was wise, fair, or even correct, so long as it truly was the reason for plaintiff's termination.") (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

When viewed in the light of this record, the fourth circuit's concern that Mr. Ayres' refusal to consider allowing Mr. Kuehnl to take a cut in pay and reinstate him is also of no moment.  Id. at 165 n.3.  Because of Mr. Kuehnl's stated opinion of the need for three people in the trimming room, and his refusal to heed the numerous admonitions of Mr. Ayres and Mr. Osmeyer that he needed to do his job in the trimming room, it would be unreasonable, as a matter of law, to expect Mr. Ayres to consider reinstating Mr. Kuehnl.  Indeed, the fourth circuit so held in precisely the same circumstances in the DeNio case:

> But, again, contrary to DeNio's arguments, the jury was not entitled to infer from the Company's refusal to consider him for an alternate position, that it had discharged him because of age. DeNio had no contractual or other right to employment with Asplundh.  The Company was entitled to fire him for a good reason, a poor reason, or no reason at all – as long as the Company did not fire him for an illegal reason.  If the Company did not fire DeNio for an illegal reason, like age discrimination, then it was not required to re-employ him.

DeNio at 3.

Likewise, the fourth circuit's concern that a factual issue existed whether Mr. Kuehnl was not doing work in the trimming room because he was legitimately occupied with other assigned tasks was resolved at trial. 364 F.3d at 165, n.3. The only evidence Mr. Kuehnl presented of "other assigned tasks" involved helping Mr. Rosenberger to set-up showrooms. However, Mr. Kuehnl admitted that he only spent a total of 10 days over a three year period setting up showrooms. As Mr. Rosenberger testified, he currently uses his teenage son to help him set up showrooms instead of Mr. Kuehnl. There can be no question that Warfield-Rohr did not need Mr. Kuehnl to perform work outside the trimming room and that Mr. Kuehnl, by his own choice, was spending only a fraction of his time working in the trimming room.

Finally, the fourth circuit questioned whether the evidence of Mr. Kuehnl's conflicts with co-workers was sufficiently conclusive to warrant judgment as a matter of law. 364 F.3d at 165. Once again, the trial record satisfies the questions raised by the fourth circuit. The fourth circuit was concerned that Mr. Ayres' notes did not state that Mr. Kuehnl was terminated due to conflicts with employees. The fourth circuit mistakenly believed Mr. Ayres testified that his notes reflected all the reasons why Mr. Ayres was terminating Mr. Kuehnl. Id. In fact, Mr. Ayres testified he prepared notes in anticipation of terminating Mr. Kuehnl because he wanted to include everything that he had to say to him and to make sure he said it accurately. (Exhibit B at 174-75). The fact that Mr. Ayres chose not to tell Mr. Kuehnl that one of the factors he considered in deciding to terminate him was that his co-workers did not like and/or get along with him does not cast doubt on the legitimacy of this reason.

Mr. Kuehnl's co-worker problem was not the primary reason for Mr. Kuehnl's termination. Mr. Ayres testified, and his notes reflect, that the main reasons for his termination

were the need to cut costs and the fact that Mr. Kuehnl refused to work in the trimming room

with only one other person.  Mr. Ayres also testified that he was concerned that Mr. Kuehnl was

having the same type of problems with Mr. Moore and Ms. Skenderovic as he had had

previously with former employees in the trimming room.  The testimony of Mr. Moore and Ms.

Skenderovic of their problems with Mr. Kuehnl are uncontradicted.  Likewise, the testimony of

the former Warfield-Rohr trimming room employees was uncontradicted:  Michael Eisenhardt

testified that he quit because of Mr. Kuehnl; Orva Kencel testified that she retired at age 62

because of Mr. Kuehnl.

       The fourth circuit also questioned the timing of Mr. Kuehnl's termination in light

of the fact that he had previously had problems with his co-workers.[7]  Id.  Again, the full trial

record answers this question.  The problems Mr. Kuehnl had with Mr. Moore and Ms.

Skenderovic developed:  (1) after Mr. Kuehnl refused Mr. Ayres' directive to operate the room

without another casket trimmer (in January 1998); (2) after Mr. Moore was hired and trained in

1998, after Mr. Kuehnl essentially stopped doing his job (beginning in late 1998); (3) after Mr.

Kuehnl admits his relationship with Mr. Ayres began deteriorating; and (4) after it became

necessary for Warfield-Rohr to cut its overhead.  The confluence of these events, including Mr.

Kuehnl's problems with his co-workers, contributed to Mr. Ayres' decision to terminate Mr.

Kuehnl.  The undisputed evidence compels only one finding – that Mr. Kuehnl was terminated

for reasons other than his age.  Indeed, for a fact finder to reach a different conclusion it would

---

[7]     The fourth circuit also erroneously believed that the only action Warfield-Rohr took in connection with these conflicts was a single statement by Mr. Osmeyer.  Id. at 165, n.4. In fact, the trial testimony showed that Mr. Osmeyer had several conversations with Mr. Kuehnl, as did Mr. Ayres.

have to rely on "speculative or conjectural inferences" and "build one inference upon another inference," which is impermissible. <u>PPM America Inc.</u>, <u>supra</u>, 875 F.Supp. at 293-96.

Under these circumstances, judgment as a matter of law is not only warranted, it is mandated. As the Seventh Circuit recognized in <u>Adler v. Madigan</u>, 939 F.2d 476, 479-80 (7th Cir. 1991), "the party opposing a summary judgment bears the burden of coming forward with evidence suggesting the presence of a disputed issue of material fact." <u>See</u> <u>also</u>, <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 250 (1986) ("Rule 56 (c)[8] provides that the trial judge <u>shall</u> then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.") (emphasis added).

In <u>Adler</u>, the plaintiff claimed he was denied a promotion because of protected whistle-blower activity. Plaintiff's employer, however, asserted that plaintiff did not receive the promotion because he was less qualified than the candidate eventually chosen for the position. 939 F.2d at 479. The Seventh Circuit applied the <u>Price Waterhouse v. Hopkins</u> mixed motive analysis and granted summary judgment in favor of plaintiff's employer even though the court assumed that plaintiff's protected (whistle-blower) activity played a role in plaintiff being passed over for the position. <u>Id</u>. The Seventh Circuit held that the employer had provided a proper reason for choosing another candidate and that the plaintiff failed to dispute that reason:

Adler offered no evidence that Franke's statement that he would not have received the AO post were it not for his whistle blowing activities was anything but truthful, or that the presence of a more qualified applicant would not be a legitimate reason to explain the Forest Service's decision not to select him.

---

[8]    The <u>Anderson</u> Court also held that the standard for granting summary judgment is the same as for granting judgment as a matter of law under Fed. R. Civ. P. 50(a). <u>Id.</u> at 250-51.

Id. at 480.

The facts of the case at bar are even more compelling than the facts in Adler since Mr. Kuehnl not only fails to dispute the non-discriminatory reasons given to him for his termination by Warfield-Rohr, but his own trial testimony and handwritten journal actually support the stated reasons.  Therefore, because the EEOC has failed to satisfy its burden of presenting a disputed issue of material fact concerning the non-discriminatory bases for Mr. Kuehnl's termination, the Court must grant judgment as a matter of law under the mixed motive analysis.  Adler, supra at 479-80; Anderson v. Liberty Lobby Inc., supra at 250; Abioye v. Sundstrand Corporation, 164 F.3d 364, 369 (7th Cir. 1998) ("…it is clear that, even if we were to assume some evidence of the existence of an impermissible motive, the evidence of a 'wholly legitimate reason for the employment decision' is overwhelming…The Corporation would still be entitled to summary judgment because there is no genuine issue regarding whether it would have made the same employment decision anyway.") (citation omitted); Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1084-85 (11th Cir. 1996) (Court affirmed the entry of summary judgment under mixed motive analysis in favor of employer despite the fact that employer had stated "under the circumstances, we did not need to employ a black at Thompson High School" because the unrebutted objective evidence showed the employer would have made the same decision absent discriminatory intent.).

## III.    WARFIELD-ROHR IS ENTITLED TO A NEW TRIAL PURSUANT TO FED. R. CIV. P. 59

Regardless of how the Court resolves Defendant's motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, Defendant requests that the Court rule on its motion for a new trial pursuant to Fed. R. Civ. P. 59.  If the Court grants its Rule 50 Motion, Warfield-Rohr requests a conditional ruling on its Rule 59 motion.

### A.    Standard of Review

A trial judge presiding over a jury trial has the authority to grant new trials "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Gasperini v. Center for Humanities, Inc., 116 S. Ct. 2211, 2222 (1996), (quoting Fed. R. Civ. P. 59(a). The fourth circuit has long held that it is the:

> duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that 1) the verdict is against the clear weight of the evidence; or 2) is based upon evidence which is false; or 3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

Atlas Food Systems and Serv. v. Crane Nat. Vendors, 99 F.3d 587, 594 (4th Cir. 1996) ( quoting Aetna Casualty & Sur. Co. v. Yeatts, 122 F.2d 350, 352-53 (4th Cir. 1941)). In making this determination, the trial court must weigh the evidence and consider the credibility of the witnesses. Swentek v. US Air, Inc., 830 F.2d 552, 559 (4th Cir. 1987). The decision whether to grant a new trial is committed to the sound discretion of the trial judge and is reviewable only in "exceptional circumstances" where there is a "manifest abuse of discretion." Wadsworth v. Clindon, 846 F.2d 265, 266 (4th Cir. 1988). In this case, a new trial must be granted because the jury's verdict is against the clear weight of the evidence, is based on evidence which is false, and will result in a miscarriage of justice.

### B.    The Court Must Order a New Trial Because the Jury's Verdict is Against the Weight of the Evidence

As described above, there is substantial undisputed evidence showing that Mr. Kuehnl was terminated for reasons other than his age. Supra, pp. 11-13. In addition, Mr. Ayres flatly denied that Mr. Kuehnl's age played any role in his termination. Exhibit B at 342-43. He explained that he terminated Mr. Kuehnl's employment because: 1) the company needed to cut

costs; 2) the trimming room had become a two person operation and Mr. Kuehnl refused to work in the trimming room with only one other person; 3) once again, Mr. Kuehnl had alienated the other trimming room employees; 4) Mr. Kuehnl was not doing his job in the trimming room; and 5) Mr. Kuehnl wanted to come and go as he pleased.  Exhibit B at 174-75; 179; 192-95; 207-08; 211; 226-30.

The EEOC's only evidence of discrimination consists of three statements purportedly made by Mr. Ayres.  Mr. Kuehnl claims that a few weeks before he was terminated, Mr. Ayres asked him how old he was and when he was going to retire.  Mr. Kuehnl claims he told Mr. Ayres that he intended to work until age 65, to which Mr. Ayres purportedly responded: "We'll see about that."  During the meeting when Mr. Kuehnl was dismissed, Mr. Kuehnl claims that Mr. Ayres told him that he was being terminated because he was "too old."  Mr. Kuehnl also claims that Mr. Ayres told him during that same meeting the he had not terminated Matt Moore because "Matt can give me more years."

Mr. Ayres denied making these statements.  Exhibit B at 342-43.  The circumstances – as well as common sense – overwhelmingly support Mr. Ayres' version of the facts.  As noted above, Mr. Kuehnl maintained a detailed journal while working at Warfield-Rohr.  Mr. Kuehnl recorded the above-referenced conversations in his journal.  Significantly, however, the two most damaging statements alleg   dly made by Mr. Ayres  -- "You are too old." and "We'll see about that.[9]" – do not appear in Mr. Kuehnl's journal.  (See Defendant's trial exhibits 5 and 24.)

---

[9]    If Mr. Ayres did not make this comment, then Mr. Ayres' purported question about how old Mr. Kuehnl was and when he planned to retire is not probative of discrimination.  Mr.

(continued...)

It is inconceivable that Mr. Kuehnl simply forgot to write these critical details in his journal.  Mr. Kuehnl testified that he tried to be as accurate as possible in his journal and to write down what people told him word-for-word.[10]  Indeed, the beginning of Mr. Kuehnl's journal entry of his conversation with Mr. Ayres on the day he was terminated mirror Mr. Ayres' notes – the words "I can't afford you" is verbatim what Mr. Ayres has in his notes.  In addition, Mr. Kuehnl's journal contains a discussion about severance payments and the date when Mr. Kuehnl would be eligible to receive his pension, the same as Mr. Ayres' notes.  (Defendant's trial exhibits 3 and 5).

There is only one explanation for why Mr. Kuehnl's journal does not contain the incriminating statement "you are too old" -- Mr. Ayres never said it.  Likewise, the reason Mr. Kuehnl's journal entry from April 28 does not contain the remark "we'll see about that" is

_____

(...continued)

Kuehnl admitted at trial that he had general discussions over the years with Mr. Ayres about his retirement plans.  Moreover, even if Mr. Ayres had asked this question, which he denies, it would not be sufficient to establish discriminatory intent or any nexus to Mr. Kuehnl's termination.  See Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994) (holding that the statement "there comes a time when we have to make way for younger people" lacks discriminatory intent); O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 549 (4th Cir. 1995) (holding that the remarks "[i]t's about time we got some young blood in this company", made two days before the plaintiff's discharge, and "O'Connor, you're too damn old for this kind of work", made two weeks before the discharge, lack discriminatory intent); EEOC v. Clay Printing Co., 955 F.2d 936, 942 (4th Cir. 1992) (holding that an employer's comment that it needed to "attract newer, younger people" failed to establish evidence of age discrimination).

[10]    Mr. Keuhnl carefully recorded in his journal what Mr. Ayres did (and did not) say to him over the years.  For example, on December 1, 1995 Mr. Kuehnl noted in his journal that Mr. Ayres thanked him for putting up the Christmas tree.  (Defendant's trial exhibit 20); On November 8, 1989, Mr. Kuehnl noted that he spent 4 1/2 hours wrapping fruit cakes, and that no one thanked him.  (Defendant's trial exhibit 19); on another occasion, Mr. Kuehnl noted that he had given Mr. Ayres two drill bits -- ½" and ¾" – and that Mr. Ayres had never brought them back.  (Defendant's trial exhibit 17).

because Mr. Ayres never said it.[11]  With respect to the alleged comment "Matt can give me more years," this statement standing alone does not show age discrimination.  Moreover, if there was any discussion of Mr. Moore, it is likely related to the fact that Mr. Kuehnl had insisted that Mr. Ayres hire Mr. Moore, and that Mr. Moore was the person demonstrating a willingness to work in the trimming room.

If the Court is not persuaded that Mr. Ayres made the statements attributed to him by Mr. Kuehnl, then the EEOC has absolutely no proof of discrimination.  However, even if the Court believes that Mr. Ayres did make these statements, the evidence set out at pages 11-13, supra, demonstrates that he would have terminated Mr. Kuehnl anyway.  As a result, the jury's verdict was against the clear weight of the evidence and a new trial must be granted.  Atlas Food, supra at 594; Swentek, supra at 559.

**C.    The Court Must Grant a New Trial Because the Jury's Verdict was Based on False Information**

The Court must also grant a new trial when it determines that the testimony of an expert witness was based on faulty assumptions or improper factual predicates.  Children's Broadcasting Corp. v. The Walt Disney Company, 245 F.3d 1008 (8th Cir. 2001) (holding that the district court properly granted a new trial when it allowed the testimony of plaintiff's expert, who admitted that he failed to consider certain factors which the expert concluded would have changed his opinion of the damages suffered by the plaintiff.  The admission of an expert's opinion based on faulty assumptions necessitates a new trial because "there is simply too great an analytical gap between the data and the opinion proffered."  Id. (citing General Electric

---

[11]    The notion that Mr. Ayres, an experienced businessman who was sensitive to age discrimination issues, would make these statements defies common sense.

Company v. Joyner, 522 U.S. 136, 146, 118 S. Ct. 512 (1997)).  This is true because "[t]he cardinal principle underlying an award of damages is to compensate, no more and no less, and although proof of damage need not be precise, its calculation must not be subject to guesswork or speculation."  Franklin v. Mazda Motor Corp., 704 F.Supp. 1325 (D. Md. 1989).

Likewise, a new trial must be granted if the jury's award was based on the testimony of a damages expert who relied on unsubstantiated facts for rendering his opinion. Irvine v. Murad Skin Research Lab., Inc., 194 F.3d 313 (1st Cir. 1999).  In Irvine, the first circuit held that it was an abuse of discretion for the court to allow the jury to hear the testimony of plaintiff's expert on damages because the expert used unsubstantiated facts in his calculation.  Id. at 321.  Specifically, the district court failed to adequately serve as the "gatekeeper" in ensuring the reliability and relevancy of expert testimony by allowing the expert's conclusion on damages despite the fact that one of the assumptions in his calculation was directly contradicted by other evidence at the trial.  Id. at 320 (citing Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167 (1999)).  "Therefore, the basic premise of the expert's opinion to justify damages…is flawed.  Absent adequate factual data to support the expert's conclusions, his testimony was unreliable."  Id. at 321.  Accordingly, a new trial was granted due to the inclusion of the flawed testimony.  Id; accord, Gumbs v. International Harvester, Inc., 718 F.2d 88 (3rd Cir. 1983) (vacating the judgment and remanding for a new trial be   ause the testimony of the plaintiff's damages expert was grounded on improper factual predicates).

It is also clear that the fundamental errors of an expert witness on the issue of damages cannot be cured simply by suggesting to the jury that it "tweak" the numbers generated by the expert witness.  Elcock v. K-Mart Corp., 233 F.3d 734 (3rd Cir. 2000).  In Elcock, the third circuit recognized that "an expert's testimony must be accompanied by a sufficient factual

foundation before it can be submitted to the jury." Id. at 754.  The admission of the expert's

testimony, despite the inclusion in his damages model of the improper assumption that the

plaintiff was 100% disabled, rendered the jury's damages award inaccurate and required a new

trial.  Id. at 756.  The Third Circuit specifically held that the jury could not simply discount the

expert's findings to correct the expert's errors:

> In sum, we believe that [the expert's] economic damages model
> relied on several empirical assumptions that were not supported by
> the records.  Although [the expert] suggested to the jury that it
> might discount the 100% disability figure that he plugged into his
> economic model, this suggestion is not sufficient to change the
> result.  In the absence of clearer instructions or emphasis by the
> witness or the court, a jury is likely to adopt the gross figure
> advanced by a witness who has been presented as an expert.
> Accordingly, the district court abused its discretion in admitting
> [the expert's] model as evidence.

Id. at 756.

The inclusion of the unsupported damages testimony requires a new trial on all

issues, not simply on damages.  The grant of a partial new trial is appropriate "only in those

cases where it is plain that the error which has crept into one element of the verdict did not in any

way affect the determination of any other issue."  Id. at 758 (quoting Romer v. Baldwin, 317

F.2d 919, 922-23 (3rd Cir. 1963)).

Here, the jury was allowed to hear the testimony of Dr. Sovan Tun, the expert

witness offered by the EEOC, who provided the only testimony regarding the damages allegedly

sustained by Mr. Kuehnl.  However, Dr. Tun's calculation of Mr. Kuehnl's back pay damages

was rife with errors, which Dr. Tun admitted during cross examination.  First, Dr. Tun admitted

that he did not realize that Mr. Kuehnl had received severance payments from Warfield-Rohr and

improperly began his damage calculations the day after Mr. Kuehnl was terminated.

Second, Mr. Kuehnl's annual salary in 2000, which served as the basis for all of Dr. Tun's calculations, was over-inflated because Dr. Tun improperly assumed that Mr. Kuehnl had received a three percent salary increase from 1999 to 2000.  In fact, as Mr. Kuehnl testified, there was no increase in his salary from 1999 to 2000.  Furthermore, Dr. Tun improperly included a three percent increase each year throughout his calculation of damages.  Dr. Tun's assumption that Mr. Kuehnl would receive a three percent salary increase in each year of his employment was wholly unsupported by the record, and was specifically contradicted by Mr. Kuehnl's admission that he did not receive any salary increase in his last year of employment at Warfield-Rohr.  Significantly, Dr. Tun admitted that his errors could not easily be fixed; rather, the errors were compounded throughout his calculations of Mr. Kuehnl's back pay and lost benefits.  In short, Dr. Tun admitted that his calculations were inflated due to his improper assumptions and incorrect factual predicates. [12]

In addition, Dr. Tun improperly estimated Mr  Kuehnl's lost benefits as 37% of his salary.  Dr. Tun admitted he made no investigation to determine whether this assumption was accurate.  Mr. Kuehnl testified that the only benefits he received from Warfield-Rohr were health insurance and his pension.  Dr. Tun testified that he did not ask whether Mr. Kuehnl had to pay for health insurance after he left Warfield-Rohr and, if so, how much he paid for health insurance.  Accordingly there is no evidence that Mr. Kuehnl suffered any damages with respect to this component of the amount claimed for lost benefits.  Dr. Tun also admitted that the

---

[12]    Dr. Tun further inflated this number by assuming that Mr. Kuehnl would have earned between 4% - 9% interest on his back pay and benefits.  These interest rates are so out of line with the actual interest rates paid by financial institutions over the last five years that his interest calculations must be rejected.

benefits component of his damage calculation included the amount Warfield-Rohr paid towards Mr. Kuehnl's pension. However, Dr. Tun had an entirely separate section of his damage calculation devoted to calculating Mr. Kuehnl's lost pension. Therefore, the benefits component of Dr. Tun's report is grossly overstated. Indeed, there is no evidence to support any of the amounts claimed for benefits.

Dr. Tun's calculation of lost pension is also flawed. Dr. Tun testified that the formula used to calculate the pension benefit is based on the employee's salary. As noted above, Dr. Tun miscalculated Mr. Kuehnl's salary for 2000 by assuming he had received a 3% increase from 1999, which was incorrect. Dr. Tun then compounded his mistake by assuming a 3% increase in salary each year. Therefore, the number which Dr. Tun used to calculate his pension damages was grossly overstated.

Dr. Tun also admitted that he based his calculations on the assumption that Mr. Kuehnl had worked until age 65, not through the date of the trial. This was clear error since any consideration of front pay, i.e., salary or benefits earned after the date of trial, was for the Court and not the jury. Duke v. Uniroyal Inc., 928 F.2d 1413, 1424-25 (4th Cir. 1991). Therefore, the pension number presented to the jury was further overstated.

The EEOC's counsel attempted to minimize Dr. Tun's errors in her closing argument, admitting to the jury that the improper factual assumptions were her fault, and suggesting to the jury that it could simply "tweak" Dr. Tun's damages calculations to come up with a reasonable number. As the third circuit ruled in Elcock, "this suggestion is not sufficient to change the result." Id. at 756. In fact, the instant situation is far more egregious than the situation in Elcock due to Dr. Tun's admission that his error was compounded throughout all of

his calculations of damages.  Due to the compounding, the jury could not simply subtract a

percentage from Dr. Tun's conclusion to reach a logical result.

It is also clear that Dr. Tun's improper and flawed calculations impacted the jury.

Dr. Tun's summary of damages was the <u>only</u> calculation of damages given to the jury, and was

the only testimony on which the jury could rely in awarding damages.

> Given the realities of litigation, the opinion of a witness impressed
> by the court with the label of "expert" may carry a great deal of
> weight with a lay jury, particularly in matters as complex as lost
> future earnings assessments.  Permitting such a witness to offer an
> opinion unsupported by a sufficient factual foundation would
> significantly increase the risk of misleading the jury and confusing
> the issues….

<u>Id</u>. at 756, n.13.  Due to the significant confusion likely created by Dr. Tun's admittedly

improper and incorrect damages calculations, a new trial must be granted.

**D.      <u>The Court must Grant a New Trial Because the Jury Instructions Were
Improper</u>**

Regardless of whether the Court finds that the jury verdict was against the clear

weight of the evidence, or based on false evidence, the Court still must grant a new trial because

the jury was improperly instructed on the issue of liability.  <u>Wyatt v. Interstate & Ocean

Transport Co.</u>, 623 F.2d 888, 892 (4th Cir. 1980).  The Court, over the objection of Defendant,

instructed the jury both under the   <u>McDonnell Douglas</u> framework and the mixed motive

framework.  This was incorrect.  The Court must decide, based on the evidence presented at trial,

which liability theory to present to the jury.  <u>Fuller v. Phipps</u>, 67 F.3d 1137, 1142-43 (4th Cir.

1995), abrogated on other grounds, <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 123 S. Ct.

2148(2003);[13] see also, Griffiths v. Cigna Corp., 988 F.2d 457, 472 (3rd Cir. 1993), partially

overruled on other grounds, Miller v. Cigna Corp., 47 F.3d 586 (3rd Cir. 1995) (Improper to

combine mixed motive and pretext jury instructions).  As shown in Section I.B.1, supra, Plaintiff

could not prevail under the McDonnell Douglas analysis.  Providing the McDonnell Douglas

instructions to the jury, along with the mixed motive instructions, was prejudicial to Defendant

because it made the determination of liability confusing.  Indeed, the jury raised a question with

the Court during deliberations concerning one of the McDonnell Douglas instructions (Court

exhibit 1).  The jury's confusion could easily have led to the misapplication of the proper

standard for determining liability.

It is well established that a new trial is warranted where a jury instruction is

"erroneous or tends to confuse the jury on a material issue."  Chute v. Sears Roebuck and Co.,

143 F.3d 629, 631 (1st Cir. 1998); Griffiths v. Cigna Corp., supra at 462 ("we will reverse if the

instructions were capable of confusing and thereby misleading the jury.")  Providing a burden

shifting instruction under McDonnell Douglas to the jury, even where the McDonnell Douglas

analysis is applicable, is improper because it "is more likely to confuse rather than enlighten the

members of the jury."  Sanders v. New York City Human Resources Administration, 361 F.3d

749, 758 (2nd Cir. 2004).

In the case at bar, the confusion inherent in the McDonnell Douglas  burden

shifting instruction was compounded by the fact that the instruction was given along with the

---

[13]    The Supreme Court's decision in Desert Palace does not impact this case since it applies
only to Title VII cases.  The fourth circuit, in the appeal of the Court's summary
judgment decision, stated "direct evidence is still a prerequisite for a mixed-motive
analysis in ADEA cases."  364 F.3d at 164, n.1; see also, Mereish v. Walker 359 F.3d
330, 339-40 (4th Cir. 2004).

mixed motive instructions.  Accordingly, the Court should grant a new trial because it improperly instructed the jury concerning liability.

In addition, the Court should also grant a new trial because it failed to give instructions requested by Defendant.  A new trial is warranted where the court fails to give an instruction supported by the evidence if the party requesting the instruction is prejudiced. Anderson v. Branen, 17 F.3d 552, 557 (2nd Cir. 1994).  The Court refused to give the jury Defendant's proposed instructions 28, 29 and 30 (copies attached hereto as Exhibit D). Defendant's proposed instruction 28 states:  "A salary-based decision, even if it correlates with years of service and/or age, cannot be a basis for an ADEA suit."  This is an accurate statement of law (Blistein, supra at 265) and is supported by the evidence at trial.  Mr. Kuehnl's salary was more than the salaries of the other two trimming room employees combined.  The jury could have easily equated Mr. Kuehnl's high salary with his age or seniority, and believed that Warfield-Rohr's legitimate cost-cutting measure was improper.  Accordingly, Defendant was prejudiced by the Court's failure to give Defendant's proposed instruction 28 and the Court should grant a new trial.[14]

**E.    The Court Must Grant a New Trial Because the Verdict was Excessive and Did Not Properly Account for the Fact that Mr. Kuehnl Failed to Mitigate His Damages**

Even if the Court does not grant Defendant's motion for judgment or a new trial based on liability, it must still grant a new trial because the verdict was excessive and failed to

---

[14]    Similarly, Defendant was prejudiced by the Court's failure to give its proposed instructions 29 and 30 which relate to damages.  See Section III.E, infra.

account for Mr. Kuehnl's failure to mitigate damages.[15]  As with the review of a jury's finding of liability, a jury's award of damages must be set aside if its is:  1) against the weight of the evidence; 2) based upon evidence which is false; or 3) constitutes a miscarriage of justice.  Cline v. Wal-Mart Stores, Inc., supra at 305; Zervitz v. Hollywood Pictures, 995 F. Supp. 596, 598 (D. Md. 1996).

Here, the jury's verdict is excessive and improper because it was based on an admittedly inaccurate expert damage report, and because Mr. Kuehnl failed to mitigate his damages.  As explained in Section III. C., supra, the jury's consideration of the EEOC's expert damage report is a sufficient reason, standing alone, to order a new trial.

In addition, the Court must order a new trial because of Mr. Kuehnl's complete failure to mitigate his damages.  A discharged plaintiff has a duty to exercise reasonable diligence in attempting to mitigate damages by finding comparable work.  Smith v. Great American Restaurants, Inc., 969 F.2d 430 (7th Cir. 1992); Cline v. Roadway Express, Inc., 689 F.2d 481 (4th Cir. 1982).  A plaintiff who fails to do so forfeits his right to back pay for the period during which the plaintiff did not seek employment.  Miller v. AT&T Corp., 250 F.3d 820, 838 (4th Cir. 2001).  Indeed, a "plaintiff cannot remain idle after an unlawful discharge and receive back pay for the period where he was not actively seeking employment."  Szedlock v. Tenet, 139 F. Supp. 2d 725, 734 (E.D. Va. 2001) (citing Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985)).

---

[15]     Alternatively, the Court should order a remittitur.  Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 305 (4th Cir. 1998).

Mr. Kuehnl's mitigation efforts fall into two categories:  1) his limited job search; and 2) his attempts to start his own business.   Neither effort was sufficient to constitute proper mitigation.  Mr. Kuehnl testified in his deposition that he decided to start his own upholstery business right after he was terminated and that he only looked for jobs during the periods when he was collecting unemployment because it was a requirement to receive unemployment payments.  (See Defendant's trial exhibit 25 attached hereto as Exhibit C).

At trial, Mr. Kuehnl tried to change his story, but the evidence is clear that he never intended to find a new job.  Mr. Kuehnl only contacted two prospective employers per week – the number required by the unemployment office.  Defendant's trial exhibits 6 and 7 are lists of his entire job search.  Mr. Kuehnl testified at trial that he made no other efforts to find a job.  Exhibits 6 and 7 reveal that Mr. Kuehnl rarely searched for a job comparable to the one which he held at Warfield Rohr, or for a job for which he was qualified.  Mr. Kuehnl inquired of the following types of employers: florists, a liquor store, a plumber, a meat market, a gas station, several bakeries, a cab company, a movie rental retail store, a nursery, a marketing firm, a printing company, a real estate firm, a restaurant, and a medical sales company.  Mr. Kuehnl readily admitted that he was not qualified for any positions with many of these companies,[16] and many others are completely unrelated to Mr. Kuehnl's work experience, which consists solely of upholstery and trimming work.

---

[16]    The Court limited Defendant's cross-examination of Mr. Kuehnl concerning his job inquiries.  Had Warfield-Rohr been allowed to inquire about Mr. Kuehnl's other efforts to find a job, Mr. Kuehnl would have testified that he did not expect to receive a job with the employers he contacted, that he did not want a job at any of those employers, and that he was not qualified to work at those employers.

Mr. Kuehnl did not inquire about potential job openings at any large companies, including large national employers with which he actually would have been qualified to hold a job, such as Home Depot, Loews, or any large furniture store. Mr. Kuehnl also admitted he did not even have a resume. Mr. Kuehnl also testified that he did not answer a single advertisement in the newspaper, and that he only <u>looked</u> at job listings in the newspaper a few times. Mr. Kuehnl simply visited places near his homes in Baltimore and Delaware in order to fulfill the requirements of unemployment – not to actually find a job. Because Mr. Kuehnl's goal was to start his own business, he did not want to find a job. Indeed, as soon as his unemployment payments ran out, he stopped looking for a job.

Therefore, the two periods in which Mr. Kuehnl purportedly looked for jobs (August 1, 2000 – January 11, 2001; and March 19, 2002 – July 25, 2002[17]) do not constitute proper mitigation. <u>See</u>, <u>e.g.</u>, <u>Szedlock v. Tenet</u>, 139 F. Supp. 2d 725 (E.D. Va. 2001) (holding that a plaintiff's efforts to mitigate were not reasonably diligent, where she made the following efforts:  1) she applied for 10 positions; 2) she placed her resume in a national database; and 3) she searched vacancy announcements periodically) (citing <u>Brady v. Thurston Motor Lines, Inc.</u>, 753 F.2d 1269, 1273 (4th Cir. 1985)).

Likewise, Mr. Kuehnl's efforts to start his own business did not constitute proper mitigation. Mr. Kuehnl testified that he decided to start his own business right after he was terminated. However, Mr. Kuehnl also testified that he did not consider his business to really be started until 2004. Mr. Kuehnl testified that he spent no time working on starting his business in

---

[17]     In his deposition, Mr. Kuehnl testified that this period when he was receiving unemployment and looking for jobs was actually March 19, 2001 through July 25, 2001 (Exhibit C).

2000 and very little time in 2001 because he needed to fix up his sister-in-law's house, sell it, and move her.  Mr. Kuehnl testified that he spent a little more time working in his business in 2002, but that, again, he spent very little time working in his business in 2003 because he had to fix up and sell his Baltimore house and prepare and move to his Delaware home.  Accordingly, it is not surprising that Mr. Kuehnl made no money in his business in 2000 or 2001, a negligible amount of money in 2002, and no money in 2003.

By Mr. Kuehnl's own admission, it was not until 2004 when he really "started his business."  Even in that year, Mr. Kuehnl testified that he made only $10,000 gross, before his materials and other costs were deducted.  Even this amount seems overstated because the only documentation submitted by Mr. Kuehnl for 2004 shows income of $2,597.50 and material costs of $431.74.  (Defendant's trial exhibit 23).

"In order to constitute mitigation, Mr. Kuehnl's decision to start his own business must have been bona fide, reasonable, and made in good faith."  Cline v. Roadway Express, Inc., 689 F.2d 481, 489 (4th Cir. 1982); Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 390-91 (D.Md. 1997); EEOC v. Joe's Stone Crab, Inc., 15 F. Supp. 2d 1364 (S.D. Fla. 1998).  In addition, self employment must be a "reasonable alternative to finding other comparable work in order to constitute mitigation."  Williams v. Imperial Eastman Acquisition Corp., 994 F. Supp. 926 (N.D. Ill. 1998) (quoting Smith v. Great American Restaurants, Inc., 969 F.2d 430, 438 (7th Cir. 1992)).

Mr. Kuehnl's decision to convert his upholstery hobby into a business was not reasonable, bona fide, or made in good faith.  Mr. Kuehnl could not have had a reasonable expectation that he would have made a comparable amount of money in his business as in his former employment with Warfield Rohr, especially considering that his only marketing efforts

34

consisted of passing out business cards.  See, e.g., Hansard v. Pepsi Cola Metropolitan Bottling Company, Inc., 865 F.2d 1461 (5th Cir. 1989) (holding that the plaintiff was not entitled to recover back pay during the period in which he started his own flea market business because his decision did not indicate reasonable diligence); Bossalina v. Lever Bros. Co., 47 Fair.Empl.Prac.Cas. 1264 (D.Md. 1986) (holding that a plaintiff's "virtually nonexistent" efforts in support of his decision to become self-employed did not constitute reasonable diligence as a matter of law).

Nor did Mr. Kuehnl use reasonable efforts to start his business.  By his own admission, it took him four years after he had decided to go into business for himself to actually "start" the business.  The multiple moves and house repairs which Mr. Kuehnl said prevented him from starting his business sooner are personal decisions which cannot constitute justifications for his failure to use reasonable diligence in obtaining new employment.  Meyer v. United Airlines, Inc., 950 F. Supp. 874, 877 (N.D. Ill. 1997) (citing Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir. 1985)).  Moreover, courts do not give plaintiffs an unlimited period of time with which to sit idly by before mitigating damages.  See, e.g., Szedlock, 139 F. Supp. 2d at 735 (holding that plaintiff would have found suitable employment within 2 years if plaintiff had reasonably attempted to mitigate damages); Ford v. Rigidply Rafters, Inc., 984 F. Supp. 386, 393 (holding that plaintiffs should have been able to find comparable employment within two years after their termination).

Despite Mr. Kuehnl's testimony that he actually started earning money in 2004, he submitted no real support.  The only documentation submitted for 2004 shows that he barely made a profit, net of material costs, of $2,000.00.  It is apparent that Mr. Kuehnl's "business" is merely an extension of his longtime upholstery hobby, which he planned to do even before he

was terminated.[18]  Mr. Kuehnl's decision to stay out of the work force and simply expand his hobby is the type of personal choice which courts have held does <u>not</u> constitute proper mitigation. <u>Williams v. Imperial Eastman Acquisition Corp</u>, 994 F. Supp. 926, 931-32 (N.D. Ill. 1998) (Plaintiff was not entitled to back pay damages because his decision to work on his family's cattle farm after a brief attempt to find comparable employment was a personal decision.).  Therefore, Mr. Kuehnl cannot recover damages for any period when he was attempting to start his own business.

Accordingly, regardless of how the Court resolves the liability issues, Mr. Kuehnl cannot be entitled to back pay because he did not mitigate his damages.  Moreover, as shown above, even if the Court finds that Mr. Kuehnl is entitled to some damages, a new trial is still warranted because Dr. Tun's report, the only evidence submitted concerning damages, is fatally flawed.  Alternatively, if the Court is persuaded that Mr. Kuehnl's job search constituted proper mitigation, it should enter a remittitur in the amount of Mr. Kuehnl's salary at the time he was terminated for the period he purportedly conducted his job search ($925.00 per week x 41 weeks = $37, 925.00).

---

[18]    Mr. Kuehnl admitted that his plans for his retirement home included a workshop where he could continue to practice his hobby after he retired.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Warfield-Rohr's motion for judgment as a matter of law, and conditionally grant Warfield-Rohr's motion for a new trial. If the Court denies Warfield-Rohr's motion for judgment as a matter of law, the Court should still grant its motion for a new trial.

Respectfully submitted,

_____

Charles S. Hirsch
Ballard Spahr Andrews & Ingersoll, LLP
300 East Lombard Street
18th Floor
Baltimore, Maryland 21202
(410) 528-5503
Attorney for Defendant
Warfield-Rohr Casket Co., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of March 2005, the two copies of the

attached Memorandum In Support Of Defendant Warfield-Rohr Casket Company, Inc.'s Motion

For Judgment As A Matter Of Law And/Or For A New Trial was sent via first-class mail,

postage prepaid, to:

Regina M. Andrew, Esquire
Equal Employment Opportunity Commission
Baltimore District Office
10 South Howard Street
Third Floor
Baltimore, Maryland 21201


_____
Charles S. Hirsch