IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

EQUAL EMPLOYMENT OPPORTUNITY ) 
COMMISSION, )
 )
Plaintiff, )
 ) CIVIL ACTION NO.  WMN-01-2872
v. )
 )
WARFIELD-ROHR CASKET )
COMPANY, INC. )
 )
Defendant. )
_____)

**EEOC'S MEMORANDUM IN SUPPORT
OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR
JUDGMENT AS A MATTER OF LAW UNDER RULE 50
AND/OR FOR A NEW TRIAL, AND/OR REMITTITUR UNDER RULE 59**

Preliminary Statement

After a four day trial, on February 25, 2005, a jury determined that Defendant Warfield-Rohr Casket Company, Inc. ("Defendant") had willfully violated the Age Discrimination in Employment Act ("the ADEA") by terminating Fred Kuehnl because of his age. The jury awarded him $397,948.75 in back pay and liquidated damages. On March 3, 2005, this Court entered judgment for the plaintiff, Equal Employment Opportunity Commission ("the Commission").

On March 14, 2005, Defendant filed its Rule 50 Motion and in the alternative, sought remittitur under Rule 59. At issue is whether sufficient evidence exists to support the jury's

verdict. As discussed fully below, Defendant's termination of Mr. Kuehnl - an employee of 29 years, its telling him that he was too old, that a younger, less experienced employee could give the employer more years, and its failure to document any write-ups or alleged performance problems whatsoever despite Defendant's practice of doing so, provided the jury with ample evidence to support its verdict of willful age discrimination. For the reasons discussed below, Defendant's Motion should be denied.

Statement of Facts

The evidence presented at trial showed the following: Defendant sells caskets and other burial products to funeral homes throughout Maryland, Virginia and Delaware. As part of its business, Defendant installs custom interiors in caskets for its customers. This process, called "trimming" a casket, is performed by "sewers" who sew the fabrics used to trim the caskets, and "trimmers" who install the fabrics in the caskets.

Fred Kuehnl has worked as a casket trimmer since about 1964. In 1971, Defendant hired Mr. Kuehnl and his only responsibility was to trim caskets. At the time, there were approximately thirteen employees working in Defendant's casket trimming room. As a casket trimmer, Mr. Kuehnl custom-designed and built casket interiors. His work consisted of designing, cutting, and installing wood and fabric trim beneath and around the interior bed of the casket. During his employment at Defendant, Mr. Kuehnl was a highly-skilled craftsman who did very good work.

Between 1971 and 1982, Mr. Kuehnl's job responsibilities as a casket trimmer stayed essentially the same. In 1982, William Ayres, Defendant's owner, promoted Mr. Kuehnl to the position of foreman. As foreman, Mr. Kuehnl was in charge of both the sewers and the trimmers, and he trained sewers and apprentice casket trimmers. When he took on these new supervisory responsibilities, Mr. Kuehnl continued to work as a casket trimmer. Casket trimming was always part of Mr. Kuehnl's job at Defendant.

Throughout his employment at Defendant, Mr. Kuehnl was a hard worker. He kept contemporaneous logs of his trimming work. These reflect that, right up until his termination, he worked long hours, including weekends and nights, to ensure that work was completed on time. Ayres often complimented Mr. Kuehnl on his work ethic, stating that he was from the "old school," working "from morning to night." Although Mr. Kuehnl never received a formal performance evaluation, he received a year-end bonus every year he worked at Defendant and a three percent salary increase every year after his promotion in 1982, except his last year with Defendant. (EEOC Trial Exh. 7 - 11).

Over the years, Defendant's trimming work declined, and by 1997 there were only three employees remaining in the trimming room: two casket trimmers, Mr. Kuehnl and Michael Eisenhardt; and one sewer, Elizabeth Skenderovic. In January 1998, Eisenhardt, then age 35, resigned. Ayres initially was reluctant to hire another trimmer, questioning the need for a third person in the trimming room. However, Mr. Kuehnl insisted that another employee was needed to keep up with work in the casket trimming department. Ayres ultimately went along

with Mr. Kuehnl's recommendation and hired Matt Moore, then age 33, to replace Eisenhardt.

Moore had some experience in upholstering but had never worked as a casket trimmer. Over the next couple of years, Mr. Kuehnl worked in the trim room with Moore, instructing him and answering his questions on how to perform his job. Even after Moore was fully trained, he was far less accomplished than Mr. Kuehnl. While Mr. Kuehnl could trim six or seven caskets in a day, Moore could not trim more than one.

During this time, Defendant was losing some of its business because a conglomerate began purchasing funeral homes in Maryland and Virginia and these funeral homes would then buy their products from a national distributor rather than from an independent like Defendant. Either on his own initiative or in response to Ayres' request, Mr. Kuehnl kept busy by performing odd jobs for the company and personal jobs for Ayres and members of his family, both on and off company time. Mr. Kuehnl noted in his log on April 7, 2000, that Ayres asked him how old he was and whether he was planning to retire. Defendant's Trial Exhibit 24. When Mr. Kuehnl responded that he intended to work until age 65, Mr. Ayres remarked, "We'll see about that." Three weeks later, Ayres called Mr. Kuehnl into his office and fired him. In the course of firing him, Ayres remarked, "You're getting too f---ing old, you're making too much f---ing money. Get the f--- out." When Mr. Kuehnl asked for a pay cut, or to work less hours, Ayres told him said, "No, get the f--- out." When Mr. Kuehnl asked Ayres why Matt Moore was wasn't being terminated instead of him, Ayres told him, "Matt could give him more years and he needed a job." Mr. Kuehnl was 56 years old at the time. Matt

Moore was 33.

Argument

## I.    THE LEGAL STANDARD APPLICABLE TO WARFIELD-ROHR'S MOTION FOR JUDGMENT AS A MATTER OF LAW

In order to justify the entry of judgment as a matter of law under Fed. R. Civ. P. 50, Defendant must demonstrate "that no issue of fact is involved and inquiry into the facts is not necessary to clarify the application of the law." McKinney v. Board of Trustees, 955 F.2d 924, 928 (4th Cir. 1992). Judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion. In re Wildewood Litigation, 52 F.3d 499, 502 (4th Cir. 1995), citing, Austin v. Torrington Co., 810 F.2d 416 420 (4th Cir.), cert. denied, 484 U.S. 977 (1987); Mays v. Pioneer Lumber Corp., 502 F.2d 106, 107 (4th Cir. 1974). See also Fed. R. Civ. P. 50(a)(1) (motion for judgment as matter of law appropriate where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue").

The application of the foregoing legal standard requires the denial of Defendant's motion for judgment as a matter of law.

## II.    THERE WAS SUFFICIENT EVIDENCE ADDUCED AT TRIAL TO SUPPORT THE JURY'S FINDING THAT WARFIELD-ROHR WILLFULLY TERMINATED KUEHNL BECAUSE OF HIS AGE.

A.    Evidence of Age Discrimination

Mr. Kuehnl testified that on his last day of work, Mr. Ayres told him that he was fired because he was "too f---ing old," that he made too much "f---ing money," and to "get the f---

5

out." Mr. Kuehnl also testified that Mr. Ayres rejected his offer to take a pay cut, by saying that the company could get "more years" out of Mr. Kuehnl's younger co-worker, Matt Moore. In addition, Mr. Kuehnl testified that a few weeks before firing him, Mr. Ayres asked him how old he was and whether he was planning to retire. When Mr. Kuehnl had told Mr. Ayres that he intended to remain with Defendant until he reached age 65, Mr. Ayres remarked, "We'll see about that."

Notably, much of Mr. Kuehnl's testimony regarding these statements was corroborated by his contemporaneous journal entries. For example, the April 7, 2000 exchange between Mr. Ayres and Mr. Kuehnl regarding the latter's retirement intentions are documented. (Defendant Trial Exhibit 24) Also, when interviewed by an EEOC Investigator, Mr. Ayres did not deny questioning Mr. Kuehnl about these retirement plans. (EEOC Trial Exhibit 3, Transcript of tape-recorded interview with Ayres on June 15, 2001) Indeed, even up to the day of his termination, Mr. Kuehnl recorded that Mr. Ayres remarked that Matt Moore could give him more years. To the extent that Mr. Kuehnl did not record verbatim every exchange in his personal diaries, these were in fact his personal journals, not transcripts of party admissions which he had planned to use one day at trial. The jury was entitled to rely on his journals which added weight to his testimony.

Even absent the unambiguous remarks related to Mr. Kuehnl's age, this case is replete with evidence establishing that age was the real reason behind his termination. Incredibly, Defendant presented testimony from Orva Kencel, Mike Eisenhardt, and Elizabeth

Skenderovic, employees who had worked with Mr. Kuehnl for 21 years, 12 years, and 5 years, respectively, who tried to persuade the jury how difficult it was working with him. Their many years of working with him, alone, belies any argument about how difficult he was as a supervisor. Moreover, while Defendant argued that towards the end of his employment, Mr. Kuehnl developed performance problems, such problems were undocumented, despite Defendant's testimony, through Ms. Skenderovic and Mike Osmeyer, that Mr. Ayres had a practice of documenting such problems. As the Fourth Circuit previously held,

> [A]lthough [Defendant] portrays [the employee's] inability to get along with his coworkers as a serious problem that had existed for several years prior to his termination, the company apparently never took any significant action to address this problem before terminating [him.] Thus, despite evidence that [the employee] did not get along with his coworkers, <u>a jury could reasonably conclude that [Defendant] would not have terminated [the employee] if his age had not been a factor</u>.

<u>EEOC v. Warfield-Rohr Casket Co.</u>, 364 F.3d 160,165 (4th Cir. 2004)(emphasis added);<u>See also</u> <u>Cathcart v. Flagstar Corp.</u>, 155 F.3d 558 (4th Cir. 1998) (unpublished)(due to absence of documented complaints and evidence of previously spotless employment record, a reasonable jury could disbelieve employer's articulated reason for not placing plaintiff in positions); <u>Walker v. American Airlines, Inc.</u>, 2004 WL 1267082 (N.D. Tex. Jun. 09, 2004) (plaintiff's lack of awareness of any counseling for poor performance suggests that evidence against him recently was fabricated and that age was the real reason); <u>Ashby v. Hanger Prosthetics & Orthotics Inc.</u>, 2003 WL 22797562 (E.D. Pa. Nov. 17, 2003)(employer's justification for removing older worker easily was rebutted due to lack of evidence documenting the

justification); <u>Stanfield v. Answering Serv., Inc.</u>, 867 F.2d 1290, 1294 (11th Cir. 1989)(the lack of complaints or disciplinary reports in an employee's personnel file may support a finding of pretext). Indeed, terminating an older worker for problems not apparent during his employment is fatal with respect to an employer's ability to obtain judgment in its favor. <u>See Miller v. Aramark Corporation</u>, 2004 WL 1781103, at *5 (N.D. Ga. July 14, 2004)("Given the length of the Plaintiff's employment without any prior serious disciplinary problems, this is enough to submit the issue of pretext to the jury"); <u>Machinchick v. PB Power, Inc.</u>, 2005 WL 138708, at * 5 (5th Cir. Jan. 24, 2005) (inference of pretext of age discrimination raised by company's failure to follow its own progressive discipline policy and issue a single verbal or written warning prior to employee's termination).

Moreover, while Defendant makes much of Mr. Kuehnl's alleged performance problems significant to justify his termination, it clearly overlooked the real performance problems demonstrated for years by Michael Eisenhardt, who admitted at trial that he suffered severe attendance problems, regularly lied about reasons for his absences and even when he appeared for work, oftentimes chose to read books or work on his motorcycle, all on company time. Unlike Mr. Kuehnl, fired from his job, Mr. Eisenhardt voluntarily left his job, not once, but twice. He was barely thirty-five years old when he voluntarily quit the second time.

Finally, while Defendant made much of the argument that casket trimming was no longer in high demand and that it therefore needed to cut costs, it summarily rejected Mr. Kuehnl's offer to accept less money and/or work fewer hours. Moreover, as adduced at trial,

though the younger employees Ms. Skenderovic and Mr. Moore are no longer needed to trim caskets, they in fact will not be losing their jobs. All this evidence could properly be relied upon by the jury in deciding that Defendant's reasons for terminating Mr. Kuehnl were pretext and that age motivated his termination.

B.     Evidence of Willfulness Adduced at Trial

The Supreme Court in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128, 105 S.Ct. 613, 625 (1985), held that a violation is willful "if the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA."  In 1993, the Court reaffirmed the Thurston standard in Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993). Significant testimony was heard at trial regarding the age-based statements made by Defendant's owner, Howard Ayres, shortly before and during the time when he fired Mr. Kuehnl. The jury decided that these statements were, in fact, made, and in light of Mr. Ayres' admission that he was familiar with the requirements of the ADEA, that his behavior evidenced intentional and willful discrimination against Mr. Kuehnl.  Moreover, as discussed above, ample evidence existed to establish that Defendant's articulated reasons for the adverse action were pretext. Defendant's incriminating remarks, coupled with the lack of credibility accompanying its articulated reasons for the termination, support the jury's finding that age motivated Mr. Kuehnl's termination and that Defendant's actions were willful. In short, ample evidence was introduced at trial to sustain a verdict of willful age discrimination.

III.    **DEFENDANT HAS NOT ESTABLISHED THAT IT WOULD HAVE TERMINATED MR. KUEHNL'S EMPLOYMENT ABSENT THE DISCRIMINATORY FACTOR.**

Defendant has argued throughout this litigation that despite any age animus against Mr. Kuehnl, it would have fired him anyway. Defendant still advances its mixed motive argument, which it is entitled to do. Defendant bears the burden to prove that the nondiscriminatory reasons for the adverse action were the real reasons. The jury, however, is not compelled to accept Defendant's version, and chose not to. Sufficient evidence exists to support the verdict that age, and age alone, compelled Mr. Kuehnl's discharge. Defendant's vigorous arguments to the contrary do not eliminate the basis for the jury's verdict.

Despite the recitation of "undisputed evidence" at pages 11-13 of Defendant's brief, none supports Defendant's argument that it would have fired Mr. Kuehnl absent his age. Defendant's argument that the casket trim room was always a two-person operation and that a third person was unnecessary, while possibly true, does not justify why Mr. Kuehnl had to be the one to be terminated, in light of his superior qualifications and experience. Moreover, Defendant continues to blame Mr. Kuehnl for assigning three people to the room, when this decision clearly was one for Defendant and not for Mr. Kuehnl. Further, it remains particularly troubling that Defendant waited until Mr. Kuehnl fully trained his younger replacement before terminating him.

The Commission does not dispute that cost-cutting, alone, does not amount to an ADEA violation. Unfortunately for Defendant, that was not the situation here and the cases now relied upon by Defendant are easily distinguishable. In <u>Blistein v. St. John's College</u>, 860

F. Supp. 256 (D. Md. 1994), the plaintiff never was told that he was too old for his job; nor were there any circumstances which could support a finding of age discrimination. Indeed, the Blistein plaintiff alleged that he was constructively forced into retirement; whereas, Mr. Kuehnl was outright fired while simultaneously being told that he was too old and made too much money. Also, the Blistein employer had offered the plaintiff an alternative position doing similar work at a lower cost to the college. Indeed, the present case never would have materialized had Mr. Kuehnl been afforded the same treatment.

By virtue of the Fourth Circuit's "Unpublished" designation in DeNio v. Asplundh Tree Expert Company, 1996 WL 423125 (4th Cir. 1996), it offers no precedential value and the Fourth Circuit has cautioned against citing to unpublished dispositions. The case is valueless to Defendant not only because it is unpublished but because it is entirely distinguishable from the present case. While here, Defendant summarily fired Mr. Kuehnl, remarking that he was too old and that his younger replacement could give the company more years, in DeNio, the employer offered the plaintiff another position in the company. Moreover, no ageist remarks were made to the plaintiff in DeNio regarding his proposed transfer. These cases offered by Defendant simply cannot form the basis for a lawful discharge when they are so factually distinct from the present case.

Nor can Mr. Kuehnl's alleged refusal to work justify his termination, independent of his age. As discussed fully above, no documentation supports this allegation and a true problem performer, Mike Eisenhardt, suffered no consequences despite his admitted refusal to work.

Unlike the plaintiffs in the cases cited by Defendant, here a 29 year employee was fired from a job with no indication that his performance in any way was substandard. In <u>Hawkins v. Pepsi Co, Inc.</u>, 203 F.3d 274 (4th Cir.), <u>cert. denied</u>, 531 U.S. 875 (2000), cited by Defendant for the proposition that "employment law 'is not a vehicle for substituting the judgment of the court for that of the employer'" (Defendant's brief at 15), a terminated employee disagreed with the employer's assessment of her poor performance and claimed that her write-ups, her poor performance appraisals, and the criticisms she received throughout her employment were racially motivated. This case is inapposite because unlike the <u>Hawkins</u> plaintiff, Mr. Kuehnl never received write-ups, poor performance appraisals, or criticisms from his employer. Indeed, he had every reason to disagree with and challenge Defendant's belated arguments of poor performance when they were asserted for the first time long after his termination in response to his charge of discrimination.

Also unhelpful to Defendant is <u>Jiminez v. Mary Washington College</u>, 57 F. 3d 369, 377 (4th Cir. 1995), wherein the plaintiff who was denied tenure failed to prove discrimination. Like the <u>Hawkins</u> plaintiff, the <u>Jiminez</u> plaintiff received annual evaluations throughout his six year probationary period setting forth goals to be accomplished in order to be awarded tenure. At the end of his probationary period when he had not met MWC's performance criteria and was denied tenure, the employer could rely on all sorts of documentation justifying the adverse decision. Again, Mr. Kuehnl had 29 years of employment with no negative feedback. Like both the <u>Hawkins</u> and <u>Jiminez</u> plaintiffs, Regina DeJarnette in <u>DeJarnette v. Corning, Inc.</u>, 133

F.3d 293 (4th Cir. 1998), received several warnings and negative evaluations during her brief probationary period. Fatal to Defendant's argument is that in all these cases, the plaintiffs were afforded meaningful feedback before their adverse action. The only feedback afforded to Mr. Kuehnl was that he was too f- - - ing old.

Also unsuccessful is Defendant's argument that Mr. Kuehnl, by virtue of his admitted work outside the trim room, only highlighted Defendant's lack of need for him in the trim room. In making this argument, Defendant ignores the abundant evidence of Mr. Kuehnl's work throughout and around Defendant's facility and outside the facility, including, going on road trips to set up casket displays, running supply errands, cutting wood at home, and working on the owners' personal homes. The jury was entitled to believe that Mr. Kuehnl was constantly busy servicing Defendant in one capacity or another. Indeed, Mr. Ayres admitted that Mr. Kuehnl on his own initiative regularly kept himself occupied performing work related to Defendant's business or to its owners. Most devastating to Defendant's argument is the fact that now that the trim room no longer will need any employees, the two younger employees are being assigned elsewhere, while still retaining their jobs.

The statistics argued by Defendant claiming that other older employees were allowed to remain are valueless in that the workforce is too small to render any such analysis significant. In any event, they do not provide a defense to age discrimination against Mr. Kuehnl. Connecticut v. Teal, 457 U.S. 440, 454-455 (1982)( Title VII case)("[P]etitioners seek simply to justify discrimination against respondents on the basis of their favorable treatment

of other members of respondents' racial group.  It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.")  Moreover, Defendant in fact never offered statistics into evidence, but rather simply testified to them in counsel's closing argument.  Because these statistics were not properly before the jury, they cannot help Defendant now.

IV.   **DEFENDANT'S DENIAL OF THE APRIL 7TH CONVERSATION ("WE'LL SEE ABOUT THAT") AND ITS DENIAL THAT MR. KUEHNL WAS NOT TOLD THAT HE WAS TOO F- - -ING OLD DOES NOT MAKE IT SO.**

Mr. Kuehnl testified that his journals were for his personal use, mainly to ensure that work got done according to his time frames and that he could adequately justify why work might be delayed. He further explained the trauma experienced on his final day of work, and made clear that entries in his journal, while not always complete and verbatim, were true and were sufficient to jog his own memory. After all, these journals were for his personal use and never were created for the purpose of becoming court records. This testimony, inherently reasonable, was accepted by the jury, which apparently determined that Mr. Kuehnl together with his journals, were credible. Defendant tries to disrupt this determination of credibility, by arguing that his testimony was inconceivable and defies common sense. Nothing supports Defendant usurping the function of the jury on this issue of credibility. Indeed, Defendant argued this issue ad nauseam to the jury, and this argument was rejected.

While Defendant primarily denies the remarks, it thereafter argues that any remarks, if made, would not be probative of discrimination. (Def. Brief at 23)  This exact issue already was addressed by the Fourth Circuit, which held that the employer's statement that a much younger employee "'could give [the employer] more years' clearly reflects [the employer's] reliance on [the employee's] age as one of the reasons for his termination." EEOC v. Warfield-Rohr Casket Co., 364 F.3d at 163.

## V.    THE JURY REASONABLY CONCLUDED KUEHNL ACTED REASONABLY TO MITIGATE HIS DAMAGES

Defendant demands a new trial, arguing the jury's verdict is excessive because it failed to account for Mr. Kuehnl's failure to mitigate damages.  (Def. Brief at 31) As we noted in our Reply to Defendant's Response and Objection to Plaintiff's Proposed Findings of Fact and Conclusions of Law, failure to mitigate damages is an affirmative defense and  Defendant failed to meet its burden of proof that Mr. Kuehnl did not mitigate his damages.  See, Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358-59 (4th Cir. 1995).

Under Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), back pay is a presumptive entitlement of a plaintiff who successfully prosecutes an employment discrimination case. Indeed, Mr. Kuehnl mitigated his damages and is entitled to the jury's award of back pay and liquidated damages.  Commissioner of Internal Revenue v. Schleier, 515 U.S. 323 (1995).

The Commission incorporates herein its Reply to Defendant's Response and Objection to Plaintiff's Proposed Findings of Fact and Conclusions of Law.

## VI.    THE JURY'S VERDICT IS NOT BASED ON FALSE INFORMATION

At trial the Commission's expert Dr. Tun testified that Mr. Kuehnl's back pay damages with prejudgment interest calculated to the end of February 2005 amounted to $378,427.47. (EEOC Trial Exhibit 5b)   The Commission also included as part of Mr. Kuehnl's back pay damages, his pension benefit loss of $50,928.41, which Dr. Tun calculated using Defendant's pension formula and adjusting that sum to present value assuming a discount rate of 4 percent. (EEOC Trial Exhibit 5a)   Dr. Tun testified that he included a three percent salary increase in his calculation for Mr. Kuehnl's back pay based on Mr. Kuehnl's actual salary history with the Defendant. At trial, the undisputed evidence was:   Mr. Kuehnl received a three percent salary increase every year for 17 consecutive years of employment except his last year of employment. Defendant argues that the assumption of a three percent increase for Mr. Kuehnl was based on false information because in one year out of 17 years Mr. Kuehnl did not get a three percent raise.  Clearly, an assumption that Mr. Kuehnl would get a three percent annual raise when he, in fact, received such a raise for 17 consecutive years of employment immediately preceding his last year of employment (a year when he did not get a raise) is patently reasonable.  Indeed, when questioned whether his opinion would be different if Mr. Kuehnl did not receive a three percent raise in his last of year of employment, Dr. Tun testified that it would not, but rather his calculation was based on a reasonable assumption in view of Mr. Kuehnl's actual salary history.  Significantly, Defendant did not present any expert testimony to counter this conclusion, or any other matter.

Dr. Tun also testified that his opinion lacked an offset for Defendant's payment of severance pay to Mr. Kuehnl. Defendant tries to complicate a simple matter. Evidence was presented that Mr. Kuehnl received severance payments of approximately $10,000.00 which Dr. Tun did not credit to his total calculation of back pay damages. But all that the severance payments amount to is a credit. It does not require an expert to provide a jury with an opinion on how to apply a credit to a damage calculation. It is simple subtraction.

In any event, the jury did not award the full amount set forth in Dr. Tun's calculations. In fact, the jury did its own calculation of back wages owed to Mr. Kuehnl and awarded significantly less than the amount set forth in Dr. Tun's back pay calculations. Therefore, Defendant's argument is moot since clearly the jury did not adopt Dr. Tun's calculation of back pay when they awarded only $198,974.38 and an equal amount in liquidated damages, mandated upon the jury's finding of willfulness. 29 U.S.C.§626(b).

Dr. Tun's calculations, fine-tuned by the jury, cannot form the basis for a new trial. The cases relied upon by Defendant only highlight the various circumstances under which a new trial would be warranted. In Children's Broadcasting Corp. v. The Walt Disney Company, 245 F.3d 1008 (8th Cir. 2001), the court affirmed the district court's grant of a new trial which found plaintiff's expert opinion speculative as it was based solely on conjecture. Here, there is no speculation or conjecture. Dr. Tun did not speculate about the 17 consecutive years of three percent salary increases given to Mr. Kuehnl by Defendant, more than the majority of his 29 years of employment. The expert in Children's Broadcasting did not consider the impact

of a new competitor in his breach of contract damages calculation.  In contrast, failing to consider the impact of a new competitor was not a simple subtraction like the severance payments to Mr. Kuehnl.  Unlike the present case, in <u>Children's Broadcasting</u>, the jury could not do the calculation needed to account for market differences. There, it needed an expert.

Similarly, in <u>Elcock v. K-Mart Corp.</u>, 233 F.3d 734 (3rd Cir. 2000), the degree of errors highlighted by the court are much higher than the degree alleged by Defendant in this case. The expert in <u>Elcock</u> overstated plaintiff's damages by 25 per cent because he assumed without a factual basis that plaintiff was 100 per cent disabled.  In addition, the expert assumed a weekly salary of more than twice what plaintiff actually earned and gave no credit for 25 per cent of plaintiff's pay after the injury.  The net result was that the lost earnings calculation was more than three times what the facts supported.  By contrast, Dr. Tun's three per cent salary increases were not based on erroneous information.  Further, by not crediting Mr. Kuehnl's severance payments (approximately $10,000.00), Dr. Tun did not create a disparity similar to the magnitude of the disparity created by the expert in <u>Elcock</u> ($400,000.00).  Most importantly, unlike the problem in <u>Elcock</u>, Defendant's severance payments did not create a situation where the jury was not expected to be able to adjust Dr. Tun's calculation by simple subtraction.

In <u>Irvine v. Murad Skin Research Lab., Inc.</u>, 194 F.3d 313 (1st Cir. 1999),  the court concluded that the expert, in projecting damages which reflected lost future sales, premised his testimony on information which was not in the record and which did not exist.  Such a fatal

flaw could not support the jury's verdict. Here, all the evidence relied upon by Dr. Tun was supported by the record and one erroneous assumption was corrected by Defendant during Dr. Tun's cross examination. In <u>Franklin v. Mazda Motor Corp.</u>, 704 F. Supp. 1325 (D. Md. 1989), the court concerned itself not with expert testimony, but with the constitutionality of statutory caps on pain and suffering under Maryland tort law, facts entirely different from this case.

Unlike the cases relied on by Defendant, the jury was not uninformed about the factors considered by Dr. Tun in reaching his back pay conclusions. On cross, Defendant brought to the jury's attention its challenges to the accuracy of Dr. Tun's calculation. In these circumstances, the Court committed no abuse of discretion, and thus no reversible error, in its decision to admit Dr. Tun's calculations and allow the jury to assess their significance. In view of the amount of time, effort and thought that the jury put into this verdict, it is valid.

## VII.  THE COURT'S JURY INSTRUCTIONS ON LIABILITY WERE NOT CONFUSING TO JURY AND PREJUDICIAL TO DEFENDANT

The U.S. Supreme Court addressed the issue of comprehensibility of jury instructions in the combined cases of <u>Sandoval v. California</u> and <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994). In <u>Sandoval</u> the justices upheld the constitutionality of California's standard instruction defining "reasonable doubt," even though in concurring opinions justices called it "ambiguous," "archaic," and "unhelpful" to jurors. <u>Id.</u> at 12, 14, 24.

Defendant's challenges to the content of the Court's liability instructions must meet the test that "is simply the practical one of whether the instructions construed as a whole, and in

light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987). A court has "considerable discretion in choosing the specific wording of instructions. "United States v. Piche, 981 F.2d 706, 712 (4th Cir.1992). "Even if instructions are flawed, there can be no reversal unless the error seriously prejudiced the challenging party's case." Atl. Ltd. P'ship of Tenn. v. Riese, 284 F.3d 518, 530 (4th Cir.2002).

Here, the Court instructed the jury using both the McDonnell Douglas and mixed motive instructions because the Commission presented enough evidence to support liability under either theory. Defendant argues for a new trial because the Court instructed the jury with more than one theory of liability. Apparently Defendant suggests that the plaintiff now has to commit to one theory of liability and cannot avail itself of multiple theories in proving a discrimination case. Defendant is simply wrong and has no authority for such a novel proposition. In Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), the Supreme Court made clear that a mixed motive instruction can be triggered by both direct evidence and by circumstantial (pretext) evidence. Nothing in the Supreme Court's opinion suggests that the plaintiff must choose just one. Here, the Court properly tailored its federal pattern jury instructions on the issue of liability to fit the facts of this case more closely. The Court's jury instructions were not prejudicial to Defendant due to any confusion, real or perceived, of the jury.

Conclusion

The jury's verdict is not against the clear weight of the evidence, and any miscarriage of justice is more seriously threatened by forcing Mr. Kuehnl to wait any longer for his damages and suffer another trial than by allowing the jury's verdict to stand.

Therefore, for the reasons discussed, EEOC respectfully requests that Court deny Defendant's motion for judgment as a matter of law and/or a new trial and/or remittitur.

Respectfully submitted,


GERALD S. KIEL
Regional Attorney


DEBRA M. LAWRENCE
Supervisory Trial Attorney


_____/s/_____
REGINA M. ANDREW
Trial Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Baltimore District Office
10 S. Howard Street, 3rd Floor
Baltimore, Maryland 21201
Tel.: (410) 962-4220