IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUAL EMPLOYMENT OPPORTUNITY  :
COMMISSION                    :
                              :
v.                            :   Civil No. WMN-01-2872
                              :
WARFIELD-ROHR CASKET COMPANY, :
INC.                          :

## MEMORANDUM

On February 24, 2005, after three days of trial and at the close of all evidence, this Court denied Defendant Warfield-Rohr Casket Company's renewed motion for judgment as a matter of law. The following day, the jury returned a verdict in favor of Plaintiff Equal Employment Opportunity Commission (EEOC). Now pending before the Court is Defendant's renewed motion for judgment as a matter of law, pursuant to Rule 50 of the Federal Rules of Civil Procedure, or in the alternative, for a new trial, pursuant to Rule 59. Paper No. 64. Also before the Court is Plaintiff's motion for equitable relief, pursuant to its proposed findings of fact and conclusions of law, requesting front pay and asking the Court to: (1) enjoin Defendant from any further violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-34, and (2) require Defendant to post an EEOC anti-discrimination notice in its workplace. Paper No. 56. The

motions are fully briefed and ripe for decision.  Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the alternative motion for judgment as a matter of law or a new trial will be denied while the motion for equitable relief will be denied in part and granted in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Mr. Fred Kuehnl worked for Defendant from 1971 until April 2000 when he was terminated.  He was hired to work in the casket trimming[1] room as an hourly wage worker and in 1982 was promoted to foreman of the trimming room and given a salary with benefits.  Every year from 1982 until his termination he was given an annual bonus and a three percent raise, except for his final year of employment in which he was not given either.  He was 56 years old when terminated.

Defendant saw a steady decline in its business in the years preceding Kuehnl's termination and had reduced the size of its overall workforce and trimming room staff accordingly.  When Kuehnl was terminated, he was one of only three workers in the trimming room.  The other two workers were both younger and earned less money than him.  One was hired, on Kuehnl's

---

[1] Casket trimming is the process by which an upholstered interior is crafted and fitted to a casket.

recommendation, 18 months earlier.

Plaintiff filed this suit in 2001 against Defendant on Kuehnl's behalf, alleging that Defendant fired Kuehnl because of his age in violation of the ADEA. This Court granted Defendant's summary judgment motion on March 17, 2003. Paper No. 28. On appeal, however, the Fourth Circuit reversed that decision and remanded the case to this Court because the record did not "conclusively show that Warfield-Rohr would have terminated Kuehnl absent any discriminatory motive." EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160, 162 (4th Cir. 2004). The case went to trial in February 2005. After a 4-day jury trial, the jury found Defendant had willfully violated the ADEA when it terminated Kuehnl. It awarded him approximately $398,000 in damages.

## II. DISCUSSION

Defendant asserts that it is entitled to judgment as a matter of law because Plaintiff cannot establish discrimination under either the pretext or the mixed motive analyses. It also asserts that it is entitled to a new trial for the following reasons: (1) the verdict is against the weight of evidence; (2) the verdict is based on false information; (3) the jury instructions were improper; and (4) the verdict was excessive and failed to account for Kuehnl's

failure to mitigate his damages.  Plaintiff asks the Court to award Kuehnl front pay, enjoin Defendant from any further ADEA violations, and require Defendant to post a notice in its workplace.

A. Judgment as a Matter of Law

The Fourth Circuit instructs that a "trial court may not appropriately enter [judgment as a matter of law] unless it concludes, after consideration of the record as a whole in the light most favorable to the non-movant, that the evidence presented supports only one reasonable verdict, in favor of the moving party." Williams v. Cerberonics, Inc., 871 F.2d 452, 458 (4th Cir. 1989).  It also considers it "axiomatic that in making this determination, the court cannot weigh the credibility of the witnesses." Id. n.5.  The Fourth Circuit warns, however, that "the question on a motion for judgment as a matter of law is thus not whether the plaintiff previously satisfied some loose proxy, but rather whether the trial record evinces a legally sufficient evidentiary basis for a reasonable jury to have reached its verdict." Gibson v. Old Town Trolley Tours of Washington, D.C., Inc., 160 F.3d 177, 181 (4th Cir. 1998) (internal quotations and citations omitted).  "The court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into

4

sheer speculation." <u>Id.</u>

Irrespective of the alternate modes of proving age discrimination under the mixed motive and pretext frameworks, an ADEA plaintiff must ultimately show the following: "(a) that an employee covered by the [ADEA] (b) has suffered an unfavorable employment action by an employer covered by the [ADEA] (c) under circumstances in which the employee's age was a determining factor in the action in the sense that 'but for' his employer's motive to discriminate against him because of his age, he would not (have suffered the action)." <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 238 (4th Cir. 1982)(internal quotations and citation omitted).  Typically, as here, the first two elements are not disputed, making the dispositive issue "the difficult, but narrow, motivational one: whether the employee was (treated unfavorably) because of his age." <u>Id.</u> at 239 (internal quotation and citation omitted).

Because Plaintiff has put forth sufficient evidence, both direct and circumstantial, that Defendant's discriminatory animus was the 'but for' cause of his termination, Defendant's motion for judgment as a matter of law will be denied. Specifically, Kuehnl testified that Defendant's owner explicitly told him he was "too f***ing old" when terminating

him.  Kuehnl further testified that he suggested that Defendant's financial needs could be met by allowing Kuehnl to keep his job at reduced pay and by firing a different employee, but Defendant's owner stated that Kuenhl's alternative was unacceptable because the other employee could give him more years and needed a job.  While the parties each put forth additional direct and circumstantial evidence in support of their respective positions, this evidence forms the heart of Plaintiff's case and this Court cannot disregard it on a Rule 50 motion (as the Fourth Circuit determined this Court erroneously did at the summary judgment stage).

Defendant makes multiple arguments asserting that age discrimination could not possibly be the 'but for' cause of Kuehnl's termination.  The Court addresses each in turn.

First, Defendant argues that its financial justification for the termination, i.e., its need to cut costs, is undisputed, thus making the termination of this highly paid employee non-discriminatory as a matter of law.  What is also undisputed, however, is that Kuehnl offered to reduce his pay to keep his job but Kuehnl's offer was refused.  Kuehnl also testified that Defendant's owner declined to fire a much younger worker instead of Kuehnl and stated that the younger worker could "give him more years" and needed a job.

Therefore, even if Defendant has conclusively proven that it had to fire someone, it does not follow that it has conclusively proven that its selection of Kuehnl for termination was not age-based.

Second, Defendant argues that, because it repeatedly reprimanded Kuehnl for workplace misconduct and he also insisted on having a minimum of three people assigned to the trimming room, it had no reason to consider Kuehnl's alternative to termination. The record at trial, however, made clear that a reasonable jury could conclude that Kuehnl's performance during his 29 years was satisfactory. He received pay raises and bonuses every year at the company from 1982 through 1999 and had no written reprimands in his file. The gravity of the 'oral reprimands' that Defendant asserts it issued on multiple occasions was reasonably open to varying interpretations. Likewise, while the record makes clear that Kuehnl advocated for and participated in the 1998 hiring of a third person in the trimming room, he never exercised managerial authority over the payroll nor did he ever make the three-person room a condition of his continued employment. A jury could fairly conclude that Kuehnl's workplace performance and his preference for a three-person trimming room were not the basis for his termination or Defendant's rejection of

7

Kuehnl's offer to accept lower pay.

Third, Defendant argues that its documentation of Kuehnl's reduced output in the trimming room (due to reduced demand) conclusively shows its non-discriminatory basis for firing him, because he performed no legitimate work for Defendant outside of the trimming room beyond the approximately three days per year he spent setting up showrooms.  Under this reduced output rationale, however, any of the three workers in the trimming room could have been terminated.  Furthermore, Kuehnl testified that he performed several jobs for Defendant outside of the trimming room including cutting wood at his home, running supply errands, performing basic maintenance at the facility, and working on the private homes of Defendant's executives.  The reduced output of the trimming room, viewed by itself or in context of the full record, does not conclusively show that Kuehnl's termination was not age-based.

Fourth, Defendant argues that in reversing this Court's summary judgment ruling, the Fourth Circuit relied on a mistaken belief that the notes used by Defendant's president when he terminated Kuehnl included every reason for the termination.  Even if this Court assumes that the Fourth Circuit mistakenly believed that the notes were plenary, that

does not erode the logical inference that failure to document or even mention this allegedly serious problem of co-worker mistreatment, which justified terminating a 29-year employee, tends to show that it was not in fact a serious problem. Furthermore, notwithstanding Defendant's testimony at trial that there was more than one conversation with Kuehnl about alienating his co-workers, the Fourth Circuit's analysis remains accurate that "the company apparently never took any significant action to address this problem before terminating Kuehnl" despite Defendant's claim that this was "a serious problem that had existed for several years prior to the termination."[2]  EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160, 165 (4th Cir. 2004).  Also undercutting Defendant's assertion that Kuehnl's alienation of co-workers prompted his firing is the fact that those workers who were allegedly

---

[2]  Whether Defendant spoke to Kuehnl only once about his relations with co-workers (as the Fourth Circuit indicated in its opinion at 165 n.4) or had multiple conversations with him (as Defendant testified at trial), the fact remains that no written reprimand, probation, suspension, or any other disciplinary action was ever taken against Kuehnl for his treatment of his co-workers (or for any other reason) in the 29 years he worked for Defendant.  Likewise, Defendant's assertion at trial that it strenuously objected to Kuehnl's practice of arriving at work before dawn and leaving before 5:00pm was not documented at any time before his termination. The jury is free to conclude that Defendant did not actually consider these problems "serious" enough to be the basis for the termination, notwithstanding Defendant's contrary testimony.

unable or unwilling to work with him had each worked a minimum of five years with him and one had worked with him for more than two decades.

### B.  New Trial

Different standards govern a Rule 59 motion for a new trial and a Rule 50 motion for judgment as a matter of law. Poynter by Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir. 1989) (citing Aetna Casualty & Sur. Co. v. Yeatts, 122 F.2d 350 (4th Cir. 1941)).  Under the former, "a trial judge may weigh the evidence and consider the credibility of the witnesses and, if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial."  Id.

As mentioned at the start of this section, Defendant believes it is entitled to a new trial for the following reasons: (1) the verdict is against the weight of evidence; (2) the verdict is based on false information; (3) the jury instructions were improper; and (4) the verdict was excessive and failed to account for Kuehnl's failure to mitigate his damages.  Again, the Court will address each argument in turn.

### 1.  Weight of the Evidence

The Court does not consider the jury's verdict to be against the weight of the evidence so as to justify a new trial. Defendant reiterates its emphatic denial of the ageist statements attributed to its president and considers it inconceivable that Kuehnl would have failed to record these statements in his assiduously maintained personal journals. Defendant also points to the overall composition of its workforce as evidence that it does not engage in age discrimination. For the reasons already stated in Section II-A, however, there is ample and significant evidence that Kuehnl's discharge was the result of age discrimination. While Defendant can certainly marshal evidence and arguments to create reasonable doubt as to what the jury determined was its illegal motivation for the termination, its evidence does not clearly outweigh the evidence put forth by Plaintiff and this Court will not disturb the jury's verdict on that basis.

2. False Information

Defendant asserts that the verdict was based upon false information because the expert testimony on damages by Plaintiff's expert Dr. Tun was impermissibly flawed. It adds that the inclusion of unsupported damages testimony requires a new trial on all issues. Specifically, Defendant claims that Dr. Tun's report and testimony: (1) failed to account for

11

Kuehnl's severance pay; (2) overstated Kuehnl's 2000 salary;
(3) improperly assumed he would have continually received 3
percent raises; (4) inflated applicable interest rates; and
(5) included front pay, which may not be submitted to a jury.

The Fourth Circuit directs that a trial judge must set
aside a verdict and grant a new trial where the verdict "is
based on false evidence or will result in a miscarriage of
justice." Poynter, 874 F.2d at 223.  In support of its
argument that Dr. Tun's testimony was false evidence upon
which the verdict was based, Defendant cites cases from other
federal circuits in which severely flawed expert testimony
served as the basis for disregarding a jury verdict.  These
cases, however, are sufficiently distinguishable and do not
support the granting of a new trial here.

In Children's Broadcasting Corp. v. Walt Disney Co., the
Eighth Circuit upheld a trial court's conditional grant of a
new trial where the trial court found the expert testimony
unreliable, "speculative, and based solely on conjecture."
245 F.3d 1008, 1018 (8th Cir. 2001).  The expert report at
issue there: (1) recommended a $177 Million award based in
part on claims that had been dismissed, (2) utterly failed to
consider the entrance of a market competitor in its damage
assessment, and (3) fundamentally misapprehended the

12

controlling law on the contract breach, which generally limited damages to a 90-day period.  Id. at 1018-19.  These errors rendered the report essentially useless to the jury, whose $20 Million verdict appeared to be substantively influenced by the report's errors.  Id. at 1019.

In Elcock v. Kmart Corp., the Third Circuit reversed a trial court's admission of expert testimony as not being grounded in the facts of the case.  233 F.3d 734 (3d Cir. 2000).  The expert calculating Elcock's lost earnings erroneously: (1) assumed that Elcock was 100 percent disabled despite having a report indicating that she was 50-75 percent disabled; (2) estimated her earnings at more than double her actual pre-injury earnings despite familiarity with her past earnings; (3) disregarded Elcock's post-injury income despite its patent presence in her tax returns; (4) persisted in using the 100 percent disability figure even after he told the jury to discount that figure; and (5) failed to consider Elcock's own expert medical testimony that her diabetes would shorten her working life.  Id. at 755-56.[3]

_____

[3]  Defendant also cites Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313 (1st Cir. 1999) (finding basic premise of testimony flawed, rendering testimony itself unreliable and granting new trial where expert testimony was based on Defendant's sales representing 100 percent of third party's business where actual sales comprised only approximately 20 percent).

The alleged infirmities in Dr. Tun's testimony do not
rise anywhere near the level of those in the cases cited by
Defendant.  Dr. Tun's testimony and report were not based
solely on conjecture and were grounded in the facts of this
case.  The errors in Dr. Tun's report, such as the omission of
Kuehnl's $10,000 severance pay and the failure to note that
Kuehnl did not receive a three percent raise in 2000, were
brought out on cross-examination and the jury's verdict
indicates that it appreciated and reasonably accounted for
these errors.[4]  The Court does not find it unreasonable to
factor in a three percent raise for each year from termination
to trial where Kuehnl had received such a raise for every year
that he was salaried except for his final year.[5]

---

[4]  Dr. Tun's report estimated Kuehnl's damages to be
$378,427.47.  The jury found his actual losses to be
$198,974.38, which was doubled under the statute by the jury's
finding that the violation was willful.

[5]  The Court is not persuaded by Defendant's argument that
because Dr. Tun's report was only based on a five-year pay
record, his assumption of three percent annual raises is not
reasonable.  The record before Dr. Tun, showing that Kuehnl
received a three percent raise for four of the last five years
he worked for Defendant, is sufficient by itself to properly
select three percent as Kuehnl's estimated annual future
raises, notwithstanding Dr. Tun's erroneous belief that Kuehnl
received the same raise all five years.  The larger
undisclosed record, in which Kuehnl also received three
percent raises every year since 1982, makes it even more
likely that three percent would be the proper estimated raise
and only bolsters the conclusion that the verdict was not
based on false evidence.  The alleged errors by Dr. Tun in

14

Defendant claims that Dr. Tun's damages testimony impermissibly included front pay by calculating Kuehnl's lost pension through the age of 65. The Fourth Circuit holds that the question of front pay under the ADEA "is one for the court sitting in equity to consider and not the jury." <u>Duke v. Uniroyal Inc.</u>, 928 F.2d 1413, 1424 (4th Cir. 1991) (vacating jury verdict that explicitly awarded $38,055 in front pay).

A review of Dr. Tun's testimony, the jury instructions, and the verdict itself shows that his lost pension testimony did not impermissibly produce a verdict that awarded front pay or was based on false information. First, Dr. Tun initially testified that $50,928.41 was the "present day value of the pension differential" or the difference between Kuehnl's pension as an employee terminated in April 2000 and that of a similarly situated employee who worked to retirement at age 65 in August 2008. He based this figure on the admittedly erroneous assumption that Kuehnl received a three percent raise in 2000. Dr. Tun had calculated $480.48 as the monthly pension differential. Yet on cross-examination, Dr. Tun, using a calculator produced by Defendant's counsel, re-calculated the monthly differential as $278 based on the

---

this regard do not render this report unreliable or insufficiently grounded in the facts of the case.

15

correct salary for 2000 and the reasonable assumption that
Kuehnl would receive three percent annual raises going
forward.  Defendant's cross highlighted the fact that Dr.
Tun's calculation assumed that Kuehnl worked through August
2008, and that had Dr. Tun calculated employment ending in
February 2005, it would produce an even smaller pension
differential.

Second, the Court subsequently instructed the jury that
"the amount of wages and benefits due [to a prevailing ADEA
plaintiff] is determined by calculating the amount that would
have been earned from the date of the adverse action to the
date you, the jury, return a verdict . . . ."  Jury
Instructions at 25.  In stark contrast to <u>Duke</u>, where the
trial judge specifically instructed the jury on how to award
front pay, this Court instructed the jury that any potential
award was limited to back pay only.

Finally, the award itself shows that the jury did not
include front pay in its calculations.[6]  Dr. Tun testified
that the appropriate damages award for Kuehnl would be
$378,427.47.  The jury, however, found his actual losses to be

---

[6]  The Court does not share Defendant's conclusory
assertion that the jury's question during its deliberation,
asking whether it had to calculate a specific damages amount,
shows that it was "hopelessly misled" by Dr. Tun's testimony.

$198,974.38.  Considering that Kuehnl's base salary in 1999
was $46,250 even before the $2700 annual bonus or any benefits
were added to the equation, and that his verdict was rendered
almost four years after his termination, it is hard to infer
how any award of less than $200,000 would include anything but
back pay.  The Court does not discern any front pay in the
jury's award nor does it believe that the jury was influenced
by any testimony regarding potential front pay.[7]

### 3.  Jury Instructions

Defendant asserts that it is entitled to a new trial
because the Court improperly instructed the jury on the issue
of liability by using both the mixed motive and pretext
frameworks, instead of only instructing under mixed motive.
It also believes that it is entitled to a new trial based on
the Court's refusal to submit its proposed instructions 28-30.

The Fourth Circuit considers jury instructions "adequate
if 'construed as a whole, and in light of the whole record,
[they] adequately [inform] the jury of the controlling legal
principles without misleading or confusing the jury to the

---

[7]  In addition to exposing the flaws in Dr. Tun's
testimony during cross-examination, Defendant was free to put
on its own damages expert but simply chose not to do so.  This
Court will not hold Dr. Tun's testimony to a more rigorous
standard on the basis that it was the only expert testimony
presented at trial.

17

prejudice of the objecting party.'"  S. Atl. Ltd. P'ship of
Tenn. v. Riese, 284 F.3d 518, 530 (4th Cir. 2002) (quoting
Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir.1987)).  Even
flawed instructions do not merit a reversal of the jury's
verdict "unless the error seriously prejudiced the challenging
party's case."  Id. (citing Hardin v. Ski Venture, Inc.,  50
F.3d 1291, 1296 (4th Cir. 1995)).

Defendant unpersuasively cites case law for the
proposition that a court cannot instruct under both the mixed
motive and pretext frameworks.  The Fourth Circuit's decision
in Fuller v. Phipps not only declines to proscribe instructing
juries on these alternative theories of liability, but also
favorably cites case law from the Third Circuit stating "an
employee may present his case under both theories and the
district court must then decide whether one or both theories
properly apply at some point in the proceedings prior to
instructing the jury."  67 F.3d 1137, 1143 n.2 (4th Cir. 1995)
(emphasis added) (quoting Armbruster v. Unisys Corp., 32 F.3d
768, 781 n.17 (3d Cir. 1994)) abrogated on other grounds by
Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003).
Similarly, while the Third Circuit's decision in Griffiths v.
CIGNA Corp. once stood for the proposition that the combined
instruction is inappropriate where the absence of direct

evidence of discrimination makes the mixed motive framework
inapplicable, the decision was premised on a fundamental
misconception of the nature of a pretext claim and was quickly
overruled.[8]  988 F.2d 457, 472 (3d Cir. 1993) overruled by
Miller v. CIGNA Corp., 47 F.3d 586, 596 (3d Cir. 1995) (en
banc).

While the instructions here addressed both the mixed
motive and pretext frameworks, that did not render them
prejudicial to Defendant so as to warrant a new trial because
the pretext framework does not ease Plaintiff's ultimate

_____

[8]  The persuasive authority of the panel decision in
Griffiths is gutted by the substantive (and erroneous)
distinction it perceived between pretext and mixed motive
claims.  The decision found the jury instructions prejudicial
based on the court's belief that the discriminatory motive in
a pretext claim must be "the sole cause of the employment
action and therefore it is inappropriate to state [in the jury
instructions] that the plaintiff only need show that the
discrimination played 'a motivating' or 'a substantial' role."
Griffiths v. CIGNA Corp., 988 F.2d 457, 472 (3d Cir. 1993)
overruled by Miller v. CIGNA Corp., 47 F.3d 586, 596 (3d Cir.
1995) (en banc) (recognizing that "sole cause" instructions in
pretext cases "would be inconsistent with a long line of
decisions of this court"); see also Abrams v. Lightolier Inc.,
50 F.3d 1204, 1212 (3d Cir. 1995) (recognizing "that to the
extent that Griffiths v. CIGNA could be read to require an
ADEA plaintiff to prove that age was the sole motivating
factor for the adverse employment action, it was overruled").
Based on this misconception, the Griffiths court believed that
the plaintiff had won his verdict only after the jury had
employed an erroneously submitted and substantially more
favorable legal standard.  Accordingly, the court found the
defendant was "clearly . . . prejudiced" by the perceived
error in the jury instruction and ordered a new trial.

burden of proof.  As the Fourth Circuit thoroughly explained
in <u>Lovelace</u>, irrespective of the applicable framework, an ADEA
defendant can only be found liable "under circumstances in
which the employee's age was a determining factor in the
action in the sense that 'but for' his employer's motive to
discriminate against him because of his age, he would not
(have suffered the action)."  <u>Lovelace v. Sherwin-Williams
Co.</u>, 681 F.2d 230, 238 (4th Cir. 1982) (internal quotations and
citation omitted).  Each of the two frameworks, ultimately
compels the jury to make the same dispositive determination of
"whether the employee was (treated unfavorably) because of his
age."  <u>Id.</u> at 239 (internal quotation and citation omitted).

Even if this Court assumes that the pretext instructions
here were superfluous or unnecessary, absent a showing that
those instructions created prejudicial confusion among the
jurors, their inclusion in the jury instructions is not
grounds for a new trial.  The Court discerns no prejudicial
confusion because immediately after giving the pretext
instructions on Plaintiff's initial burden of establishing a
presumption of discrimination, Jury Instructions at 18, the
Court instructed the jury that it cannot find for Plaintiff if
Defendant "would have made the same decision to fire Mr.
Kuehnl even if it had not taken the illegitimate factor of age

into account."  Jury Instructions at 19.

Defendant argues that the jury's written question to the
Court, asking it to define "replaced" as it appears in the
instructions on Plaintiff's burden to show an initial
presumption of discrimination under the pretext framework,
demonstrates that the jury was so confused as to prejudice
Defendant.  The Court disagrees.  Even if the Court looks at
the issue in the light most favorable to Defendant and assumes
the following: (1) the pretext instruction was improper; (2)
the jury was confused by the pretext instruction; and (3) the
jury misapplied the pretext instruction to the facts before
it, it still does not follow that the jury did not appreciate
or obey the next instruction that it "must consider further
whether the illegitimate factor of age was a motivating factor
in the employment decision to terminate Mr. Kuehnl" and that
it could not find for Plaintiff unless it found that Defendant
"would have made the same decision to fire Mr. Kuehnl even if
it had not taken the illegitimate factor of age into account."
Therefore the alleged deficiencies in the jury instructions do
not warrant a new trial.

The Court also rejects Defendant's assertion that its
refusal to issue proposed jury instructions 28-30 warrants a
new trial.  The Fourth Circuit holds that "[a] set of legally

21

accurate instructions that does not effectively direct a
verdict for one side or the other is generally adequate."
<u>Hardin v. Ski Venture, Inc.</u>, 50 F.3d 1291, 1294 (4th Cir.
1995).  Where the defendant complains that "the instructions
were not as complete as [it] would have liked . . . . the
'test of adequacy of instructions . . . is simply the
practical one of whether the instructions construed as a
whole, and in light of the whole record, adequately informed
the jury of the controlling legal principles without
misleading or confusing the jury to the prejudice of the
objecting party.'"  <u>Sasaki v. Class</u>, 92 F.3d 232, 242 (4th Cir.
1996) (quoting <u>Spell v. McDaniel</u>, 824 F.2d 1380, 1395 (4th Cir.
1987)).  As explained above, the instructions correctly stated
the law and none of the alleged deficiencies prejudiced
Defendant.

    4.  <u>Mitigation</u>

    Defendant argues it is entitled to a new trial because
the verdict was excessive and shows that the jury failed to
consider Kuehnl's duty to mitigate his damages.  Defendant
bases its assertion of excessiveness on the errors in Dr.
Tun's expert testimony, but for the reasons already stated in
Section II-B-2 the Court rejects this assertion.  Defendant
specifically asserts that Kuehnl failed to mitigate because

his job search was merely perfunctory and his efforts to start his own business were not bona fide.

The Fourth Circuit holds that "a Title VII plaintiff[9] is generally entitled to back pay 'as a matter of course,' unless the defendant comes forward with evidence that the plaintiff did not exert reasonable efforts to mitigate her damages." Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358 (4th Cir. 1995) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 420 (1975)) (internal citations omitted); see also Los Angeles Dept. of Water & Power v. Manhart, 435 U.S. 702, 719 (1978) (stating the "presumption in favor of retroactive liability can seldom be overcome").  Likewise, "[p]laintiffs in ADEA cases have a duty to mitigate their damages by seeking other available employment with reasonable diligence," but it is the defendant's burden to show that plaintiff failed to do so. Cline v. Roadway Exp., Inc., 689 F.2d 481, 488-489 (4th Cir. 1982).

Kuehnl's efforts to find new work were sufficient to allow a jury to conclude that he exerted reasonable efforts to mitigate his back-pay damages.  Kuehnl testified that he

---

[9]  Here, the fact that Plaintiff is proceeding under the ADEA, instead of Title VII, does not change the analysis. See, e.g., Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir. 1994) (referring to Title VII as "the ADEA's closest statutory kin").

23

pursued multiple job listings after his termination, but that his marketability was severely limited because his life's work was devoted to the now virtually nonexistent field of casket trimming.  He also testified that he distributed advertisements soliciting business as an independent upholsterer in the area around his retirement home in Delaware but that his business was slow to get off the ground.

On cross-examination and in closing arguments, Defendant challenged the reasonable diligence of Kuehnl's job search, noting: (1) that he was not qualified to work for some of the employers to whom he had applied for jobs; (2) that he had not applied to large-scale employers like Wal-Mart or Lowe's; (3) that his attempt to start his business was not a bona fide business pursuit but indulgence of a mere hobby; and (4) that starting his own business was further undermined and delayed by Kuehnl's attention to his (and his sister-in-law's) home sale and move from Baltimore to Delaware.

Again, while Defendant may marshal arguments and facts in support of its assertion that Kuehnl's efforts to mitigate were inadequate or unreasonable, Plaintiff can likewise argue credibly that Kuehnl's efforts were reasonable.[10]  Ultimately,

---

[10]  Defendant's citations to case law do not alter the Court's analysis.  See, e.g., Bossalina v. Lever Bros. Co., 1986 WL 9814, *3 -4 (D. Md. June 11, 1986) (granting summary

this fact question was properly put before the jury who rendered its verdict accordingly.  The Court sees no reason to disturb the jury's considered verdict at this point in the proceedings and declines Defendant's invitation to do so.

### C.  Equitable Relief

Following trial, Plaintiff moves for equitable relief, pursuant to its proposed findings of fact and conclusions of law, seeking front pay and an injunction against further ADEA violations as well as requiring Defendant to post an anti-discrimination notice in its workplace.  The request for front pay will be denied, but the request for the injunction against further ADEA violations and for Defendant to post a notice will be granted.

### 1.  Front Pay

The Fourth Circuit directs that "front pay is to be made available to a plaintiff under the ADEA [at] the discretion of the trial judge who must consider a host of factors . . . ." Duke v. Uniroyal Inc., 928 F.2d 1413, 1424 (4th Cir. 1991).  It cautions that "[b]ecause of the potential for windfall,

---

judgment to employer where "record is barren of evidence which specifically supports an inference of age discrimination" and "evidence is undisputed that four of [six] plaintiffs did [not mitigate]. . . . [where, inter alia, they did] not deny that they failed to exercise reasonable diligence to find and maintain suitable reemployment").

however, its use must be tempered." Id.  In providing
equitable relief, the trial judge should tailor "a blend of
remedies that is most likely to make the plaintiff whole."
Id. at 1423.

    Because the award of front pay here would represent a
windfall for Kuehnl, the request will be denied.  The jury
found Kuehnl's actual damages during the nearly five-year
period from his April 2000 termination through his February
2005 trial to be $198,974.38.  The jury awarded Kuehnl double
that amount, however, almost $400,000, because it found the
ADEA violation was willful.  Considering that Kuehnl's
retirement date is August 2008, less than four years from the
date of the verdict, the Court sees no equitable reason to add
to the considerable jury verdict, which has already achieved
the statutory goal of making him whole.

    2.  Injunctive Relief

    Under Title VII's enforcement provisions for injunctive
and equitable relief, "[i]f the court finds that the
respondent has engaged in . . . an unlawful employment
practice . . ., the court may enjoin the respondent from
engaging in such unlawful employment practice . . . ."  42
U.S.C. § 2000e-5(g)(1).  The Fourth Circuit, however, has
stated in dicta that "when a plaintiff has prevailed and

26

established the defendant's liability under Title VII, there
is no discretion to deny injunctive relief completely."
<u>United States v. Gregory</u>, 871 F.2d 1239, 1246 (4th Cir. 1989)
(citation omitted).  In opposition to Plaintiff's proposed
findings of fact and conclusions of law, Defendant only
contests the proposed award of front pay and mandatory notice
posting.  It does not oppose being enjoined from further
violations of the ADEA.  Plaintiff's request for an injunction
against further violations of the ADEA by Defendant will
therefore be granted.

    Regarding Plaintiff's request for a posted anti-
discrimination notice, Defendant argues that because
Defendant's then-president is deceased and Plaintiff never
alleged that Defendant nurtured any kind of institutional bias
against older workers, it should be denied.  The text of the
ADEA itself, however, controls the Court's decision on this
matter.  While not mentioned in the parties' briefing on the
issue, Congress already requires employers to post the
contested notice proferred by Plaintiff regarding employees
rights under the ADEA.  <u>See</u> 29 U.S.C. § 627.[11]  The Court will

---

[11]  The statute reads:
     Every employer, employment agency, and labor
organization shall post and keep posted in
conspicuous places upon its premises a notice to be
prepared or approved by the Equal Employment

27

therefore grant Plaintiff's request to require Defendant to post the notice requested by the EEOC provided that, in its final form, it deletes the first paragraph, which states the notice is posted by agreement of the parties, and correctly identifies Defendant's President.

## III.  CONCLUSION

For the reasons stated above, Defendant's motion will be denied.  Plaintiff's request for front pay will be denied. Plaintiff's request for injunctive relief will be granted.  A separate order consistent with the reasoning of this Memorandum will follow.

_____/s/_____<br>
William M. Nickerson<br>
Senior United States District Judge

Dated: June 29, 2005

_____

    Opportunity Commission setting forth information as
    the Commission deems appropriate to effectuate the
    purposes of this chapter.
29 U.S.C. § 627